

1999 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

11-2-1999

# United States v Applewhaite

Precedential or Non-Precedential:

Docket 98-7541, 98-7624

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1999

Recommended Citation

"United States v Applewhaite" (1999). *1999 Decisions.* Paper 297.
http://digitalcommons.law.villanova.edu/thirdcircuit_1999/297

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1999 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed November 2, 1999

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 98-7541/7624

UNITED STATES OF AMERICA; GOVERNMENT OF THE
VIRGIN ISLANDS

v.

VICTOR McDENE APPLEWHAITE,
        Appellant No. 98-7541

UNITED STATES OF AMERICA; GOVERNMENT OF THE
VIRGIN ISLANDS

v.

LYDIA GROUBY ROMERO;
VICTOR McDENE APPLEWHAITE;
        Lydia Grouby Romero,
        Appellant No. 98-7624

Appeal from the Judgment of the District Court
of the Virgin Islands, Division of St. Croix
(D.C.V.I. Criminal No. 1997-0019, STX)
District Judge: Hon. Raymond L. Finch

Argued: April 15, 1999

Before: NYGAARD, McKEE and RENDELL, Circuit Judges

(Opinion filed: November 2, 1999)

JOSEPH J. MINGOLLA, ESQ.
 (Argued)
21A Bjerge Gade
P.O. Box 9820
St. Thomas, United States Virgin
 Islands 00801
Attorney for Appellant, Lydia Grouby
Romero

JACQUELINE WARNER MILLS, ESQ.
#250 Peter's Rest
Christiansted, St. Croix, United
 States Virgin Islands 00820
Attorney for Appellant, Victor McDene
Applewhaite

JAMES A. HURD, JR. ESQ.
United States Attorney
JAMES R. FITZNER, ESQ. (Argued)
Assistant United States Attorney
1108 King Street -- Suite 201
Christiansted, St. Croix, United
 States Virgin Islands 00820
Attorneys for Appellee

OPINION OF THE COURT

McKEE, Circuit Judge.

In this consolidated appeal, Victor McDene Applewhaite
and Lydia Grouby Romero allege that their conviction for
numerous federal and territorial crimes must be reversed
because the evidence presented at their joint trial was
insufficient to sustain the jury's verdict.1

_____

1. Appellants also challenge their convictions on constitutional grounds,
but those arguments require little discussion. Romero relies upon United
States v. Lopez, 514 U. S. 549 (1995), to argue that Congress exceeded
its authority under the Commerce Clause in enacting 18 U. S. C. S 2119.
However, two months after the Court decided Lopez, we rejected an
identical challenge to the carjacking statute. In United States v. Bishop,
66 F.3d 569, 590 (3d Cir. 1995) we held, inter alia, that because motor

2

The defendants were convicted of conspiracy in violation 18 U. S. C. S 371 (Count 1); carjacking in violation 18 U. S. C. S 2119(2) (Count 2); hindering the communication of information relating to the commission of a federal offense violation of 18 U. S. C. S 1512(b)(3) (Count 3); and destruction of evidence in violation of 18 U. S. C. S 1512(b)(2)(B) (Count 4). They were also convicted of the territorial crimes of attempted first degree murder in violation of 14 V. I. C. SS 922(a)(1), 331 and 11 (Count 5) and kidnapping in violation of 14 V. I. C. #8E8E # 1051 and 11 (Count 6). We agree that the evidence presented at trial was insufficient to support the defendants' convictions for carjacking under 18 U. S. C. S 2119(2) (Count 2), and we will therefore reverse as to that count of the indictment. However, we will affirm as to the remaining counts.

_____

vehicles are "instrumentalities of interstate commerce," it was within Congress' authority under the Commerce Clause to "criminalize activities affecting their use even though the wrongful conduct, such as carjacking, occurs wholly intrastate." Moreover, we note that seven other circuit courts of appeals have held that Lopez does not undermine the constitutional validity of the 18 U. S. C. S 2119. See United States v. Rivera–Figueroa, 149 F.3d 1 (1st Cir. 1998); United States v. Romero, 122 F.3d 1334 (10th Cir. 1997), cert. denied, ___ U. S. ___, 118 S. Ct. 1310 (1998); United States v. Hicks, 103 F.3d 837 (9th Cir. 1996); United States v. McHenry, 97 F.3d 125 (6th Cir. 1996); United States v. Coleman, 78 F.3d 154 (5th Cir. 1996); United States v. Hutchinson, 75 F.3d 626 (11th Cir. 1996); and United States v. Robinson, 62 F.3d 234 (8th Cir. 1995).

Applewhaite also argues that the witness tampering statute, 18 U. S. C. S 1512, is unconstitutionally "overbroad," as applied to him, because the government "has suggested" that the statute is not limited to the federal charges but to the territorial charges as well. Applewhaite's Br. at 8-9. His argument is without merit. The witness tampering statute's reach is limited to tampering that "affects a federal proceeding or investigation," United States v. Bell, 113 F.3d 1345, 1348 (3d Cir. 1997), and Applewhaite has not pointed to anything in the record that would indicate that the government suggested otherwise. Moreover, here, the District Court clearly instructed the jury that the witness tampering charges applied only to the federal charge of carjacking. Jt. App. at 500a–502a. As discussed infra, the prosecution's failure to prove the federal offense of carjacking does not negate the fact that the prosecution for that offense was a "federal proceeding" under S 1512.

I. FACTUAL BACKGROUND.

Were this case not so tragic, it could quite properly be classified as "A Comedy of Errors." Lydia and Eddie Romero had been married for approximately 17 years. The events that underlie this appeal clearly show that theirs was not the happiest of relationships. As of April, 1997 they had been separated for about two years and the period of their separation had been marked by rancorous arguments and violence as well as allegations that Lydia had threatened to kill, and had assaulted Eddie. Lydia, who was a Virgin Islands Police Officer, had become romantically involved with Victor Applewhaite, who was also a Virgin Islands Police Officer.

In the morning of April 19, 1997, Lydia Romero and Eddie Romero had a heated argument about the latter's delinquency in his child support and mortgage payments. That evening, Lydia Romero telephoned Eddie Romero and told him to come immediately to her home because she needed to speak to him about their daughter. Eddie Romero asked if the matter could wait until the following day, but Lydia insisted that it was important that they speak then. Consequently, Eddie drove his white van to Lydia's home.

When he arrived, Lydia was waiting outside in the front yard. Eddie got out of his van and rested against it near a small gate in a stone wall. The wall separated Eddie from Lydia. Lydia told Eddie to wait outside the stone wall until she penned the dogs; however, she made no move to pen the dogs. Rather, she remained in place, staring at Eddie Romero. As she stood staring at Eddie, he was knocked unconscious by three blows from behind.

Jean and Marie Hepburn lived across the street from Lydia Romero. During the night of April 19th going into the morning of April 20th, Jean Hepburn was awakened by barking dogs. He also heard something that sounded like someone being beaten with a stick or a bat, and, two or three minutes later, he heard the sound of Lydia Romero's Ford Explorer leaving the area, only to return about thirty minutes later. Marie, Jean's wife, was also awakened by the barking dogs and also heard something that sounded like someone being hit with a stick. A little later she heard a car

4

leave, and, within two minutes she heard Lydia Romero's Explorer leave. About one half-hour later she also heard Romero's Explorer return.

Sometime after being knocked unconscious, Eddie Romero awoke inside his van to see Applewhaite driving the van. Applewhaite had his left hand on the steering wheel, and he was holding a gun in his right hand. As Eddie regained consciousness, he and Applewhaite began to struggle as he attempted to grab Applewhaite's gun. As they wrestled for the gun, Eddie Romero was shot. Applewhaite, who was unable to drive, control the gun, and wrestle with Romero at the same time, lost control of the van which crashed into surrounding vegetation. After the crash, Applewhaite got out of the van, turned and fired two more bullets into Eddie Romero, and then ran from the scene. Police later discovered a bloody baseball bat and latex gloves in the well below the driver's seat of the van, and Applewhaite's fingerprints were recovered from the van's hood.

Fortunately for Romero, Applewhaite was no better at aiming a gun than he was at kidnapping or driving a "getaway" car. Accordingly, none of the bullets that Applewhaite fired into Romero were fatal. Romero was treated for 3 bullet wounds, shock, blunt force trauma that was consistent with having been struck with a baseball bat, and released from the hospital.

At approximately 4:00 a.m. the day after Romero was assaulted, Lydia Romero contacted another Virgin Islands police officer, Akeem Newton, and told him that she had heard on the radio that Eddie Romero had been beaten-up. Newton went immediately to Lydia Romero's house. There, he noticed that the stone wall in front of the house had recently been painted. Later that morning, Newton had seen Lydia Romero painting the wall and plantingflowers in the earth abutting it. At Lydia Romero's urging, Newton had helped her plant flowers.

The Hepburns also saw Lydia Romero painting the stone wall. Jean Hepburn saw Lydia Romero standing by her front gate with a bucket, cleaning the stone wall in front of her house with a rag or a chamois after he got out of bed

5

on the morning of April 20th. Shortly thereafter, he saw "a young Spanish guy by the street with a pick digging, planting flowers and [Lydia] Romero was there with -- they was painting the wall." Joint Appendix at 41a. About 7:00 a. m. on the morning of April 20th, Marie Hepburn also saw a "young Puerto Rican guy" painting the wall and saw Lydia Romero planting flowers in front of the wall. Id. at 62-63. The stone fence had never previously been painted during the 18 years the Hepburns lived across the street from Lydia Romero. Forensic analysis later revealed Eddie Romero's blood on the stone wall and in the soil beneath it.[2]

On the morning of April 20th, Lydia Romero told Newton that she was concerned that Eddie Romero might try to implicate her in the attack; and that if anyone asked, he (Newton) should say that he spent the preceding night with her. Later that day, Applewhaite contacted Newton, and informed him that Lydia Romero had been arrested. Applewhaite also reminded Newton of Lydia's request that Newton tell anyone who inquired that Lydia and Newton had spent the night together.

Lydia Romero and Applewhaite were subsequently indicted for the aforementioned violations of federal and territorial law and jointly tried before a jury. Lydia Romero did not testify at trial. However, Applewhaite did testify. He admitted hitting Eddie Romero with the baseball bat, but he testified that he did so because Eddie was threatening Lydia with a gun. Applewhaite explained that when he realized what he had done, he put on the latex gloves that he retrieved from Lydia's car, and he then put Eddie Romero in Eddie's own van in order to take him to the hospital. According to Applewhaite's testimony, Eddie woke-up as he was being taken to the hospital, a struggle ensued, and a gun that Applewhaite just happened to be holding went off. The jury rejected Applewhaite's version of what happened and convicted both defendants of all charges. This appeal followed.[3] We will limit our discussion

_____

2. Counsel stipulated that the blood that was recovered from the wall and the soil was that of Eddie Romero.

3. The district court had jurisdiction pursuant to 4 V. I. C. S 32 and 48 U. S. C. S 1612(a) and (c). We have jurisdiction pursuant to 28 U. S. C. S 1291.

6

to the defendants' attack upon the sufficiency of the evidence.

II. STANDARD OF REVIEW.

In reviewing the sufficiency of the evidence to sustain a conviction we review the evidence in the light most favorable to the government as verdict winner. United States v. Stansfield, 101 F.3d 909, 911 (3d Cir. 1996). "We must affirm the convictions if a rational trier of fact could have found defendant guilty beyond a reasonable doubt, and the verdict is supported by substantial evidence." United States v. Coyle, 63 F.3d 1239, 1243 (3d Cir. 1995).

III. FEDERAL CONVICTIONS.

A. Conspiracy.

We begin our discussion with the defendants' assertion that there was insufficient evidence to support their conspiracy convictions. Count 1 of the superseding indictment charged that Romero and Applewhaite agreed with each other to commit three related federal crimes, viz., (1) carjacking; (2) hindering the communication of information relating to the commission of a federal offense; and (3) destruction of evidence to be used in an official proceeding. Section 371 of Title 18 provides, in relevant part, that "[i]f two or more persons conspire to commit any offense against the United States, . . . and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both."

"In a conspiracy indictment, the gist of the offense is the agreement and specific intent to commit an unlawful act, and when required by statute, an overt act." United States v. Wander, 601 F.2d 1251, 1259 (3d Cir. 1979). Here, the defendants challenge only the first element of their conspiracy convictions. They argue that the government did not prove an illicit agreement beyond a reasonable doubt. Thus, we must determine if the evidence at trial would have allowed a reasonable juror to conclude beyond a reasonable

7

doubt that the defendants "shared a unity of purpose, [or] the intent to achieve a common goal and an agreement to work together toward the goal." United States v. Wexler, 838 F.2d 88, 90-91 (3d Cir. 1988) (citation and internal quotations omitted).

The defendants correctly note that there is no direct evidence of any agreement between them to commit any acts furthering any of the three objects of the conspiracy. However, direct evidence is not required. Although each element of a criminal conspiracy must be proven beyond a reasonable doubt, each may be proven entirely by circumstantial evidence, United States v. McGlory, 968 F.2d 309, 321 (3d Cir. 1992). The law merely requires that "the inferences drawn must have a logical and convincing connection to the facts established." United States v. Casper, 956 F.2d 416, 422 (3d Cir. 1992). Accordingly, we must examine the evidence that was presented as to each of the substantive crimes that the government alleged as objects of the conspiracy and determine if the quantum of evidence supports each of their convictions.

1. Carjacking.

In order to be convicted of carjacking under 18 U. S. C. S 2119,4 the government"must prove that the defendant (1)

_____

4. The text of the carjacking statute provides:

> Whoever, with the intent to cause death or serious bodily harm takes a motor vehicle that has been transported, shipped, or received in interstate or foreign commerce from the person or presence of another by force and violence or by intimidation, or attempts to do so, shall--

> (1) be fined under this title or imprisoned not more than 15 years, or both,

> (2) if serious bodily injury (as defined in section 1365 of this title,
> including any conduct that, if the conduct occurred in the special maritime and territorial jurisdiction of the United States, would violate section 2241 or 2242 of this title) results, be fined under this
> title or imprisoned not more than 25 years, or both, and

> (3) if death results, be fined under this title or imprisoned for any
> number of years up to life, or both, or sentenced to death.

18 U. S. C. S 2119.

with intent to cause death or serious bodily harm (2) took a motor vehicle (3) that had been transported, shipped or received in interstate or foreign commerce (4) from the person or presence of another (5) by force and violence or intimidation." United States v. Lake, 150 F.2d 269, 272 (3d Cir. 1998)(internal quotations omitted).

In Holloway v. United States, ___ U. S. ___, 119 S. Ct. 966 (1999) the Supreme Court clarified the mens rea required for carjacking.

> [t]he intent requirement of S 2119 is satisfied when the Government proves that at the moment the defendant demanded or took control over the driver's automobile, the defendant possessed the intent to seriously harm or kill the driver if necessary to steal the car (or, alternatively, if unnecessary to steal the car).

119 S. Ct. at 972 (emphasis added). Thus, the statute

> directs the factfinder's attention to the defendant's state of mind at the precise moment he demanded or took control over the car "by force and violence or by intimidation." If the defendant has the proscribed state of mind at that moment, the statute's scienter element is satisfied.

Id. at 970. Here, it is clear that the required scienter was never established. Although the defendants clearly intended to seriously harm or kill Eddie Romero, neither their evil intent, nor the force they employed in furtherance of it, had any nexus to the subsequent taking of his van. The force was employed in an attempt to harm Eddie Romero. It was not used to take his van.

It is, of course, uncontested that Romero's van was taken after he was violently assaulted. But that does not establish that the force was used to get control of his van. Even when this record is viewed in the light most favorable to the government, it is clear that the prosecution failed to establish the required nexus between the assault and the taking. Rather, the record establishes that the van was taken as an afterthought in an attempt to get Romero's limp body away from the crime scene. That is not sufficient to establish the intent required under S 2119.

9

The carjacking statute reflects Congress' "intent to authorize federal prosecutions as a significant deterrent to a type of criminal activity that was a matter of national concern." Holloway v. United States, ___ U. S. at ___, 119 S. Ct. at 970. Congress was concerned about persons who used force or intimidation to steal motor vehicles.

The government attempts to argue that the defendants took Romero's car in order to transport his body away from the crime scene without contaminating their own cars with evidence, and that this satisfies the elements of S 2119. The government asserts:

> Without question, the trial evidence . . . would lead a reasonable juror to properly conclude that by no later than . . . when Eddie Romero arrived in front of appellant Romero's residence, both appellants were acting in concert to implement a plan whereby Eddie would be assaulted, thereby giving the appellants control over his van and the means to transport his body from the crime scene. Further, a reasonable jury could well find that, based upon the appellants' background as police officers, they knew that Eddie could not be transported away in their vehicles for fear of contaminating it with blood and other evidence. .. . Accordingly, appellants' assertions that the government failed in its burden of proof should be summarily dismissed. U.S. v. Holloway, ___ U.S. ___, 119 S.Ct. 966, 972 (1999) ("The intent requirement of S 2119 is satisfied when the Government proves that at the moment the defendant . . . took control over the driver's automobile the defendant possessed the intent to seriously harm or kill the driver if necessary to steal the car, alternatively, if unnecessary to steal the car.")

Appellee's Br. at 27. However, the government's reliance upon Holloway disproves the government's position. It simply makes no sense to suggest that Eddie Romero was assaulted so that the defendants could transport his body away from Lydia Romero's home. The reason the defendants assaulted Romero was not to transport his body in his own car. Rather, the force was used solely for the purpose of bludgeoning Romero. That was the object of the assault. It was not the means of stealing his car. After

10

defendants accomplished their objective, they dragged Romero's unconscious body to his car, and drove away. However, under Holloway, unless the threatened or actual force is employed in furtherance of the taking of the car, there is no carjacking within the meaning of 18 U.S.C. S 2119. Accordingly, the defendants' conviction for carjacking can not stand.

2. Hindering Communication of Information.

Defendants were convicted of hindering the communication of information relating to the commission of a federal offense in violation of 18 U. S. C. S 1512(b)(3). Section 1512(b)(B)(3) provides in pertinent part:

> Whoever . . . corruptly persuades another person, or attempts to do so, or engages in misleading conduct toward another person, with intent to . . . hinder, delay, or prevent the communication to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense . . .

shall be punished according to the provisions of the statute. As noted above, Romero and Applewhaite tried to persuade Newton to provide a false alibi for Romero. Both defendants now argue that the evidence was not sufficient to allow the jury to infer that Newton would provide a false alibi to a federal law enforcement officer. However, their argument misconstrues the force and breadth of the statute.

Here, as noted above, Newton testified that Lydia Romero asked him to tell anyone who asked that he spent the night with her. Newton further testified that Applewhaite telephoned him after Romero's arrest and told him to remember what Romero had requested him to say. Thus, Newton's testimony is sufficient evidence to allow the jury to infer that Applewhaite and Romero agreed to persuade Newton to provide false information to law enforcement officials. In fact, if Newton's testimony is believed, no other inference is possible; and it is obvious from the jury's verdict that the jurors did believe Newton.

11

We have previously stated that under S 1512

> the government must prove that at least one of the law-enforcement-officer communications which the defendant sought to prevent would have been with a federal officer, but the government is not obligated to prove that the defendant knew or intended anything with respect to this federal involvement. . . .[T]he government may carry this burden by showing that the conduct which the defendant believed would be discussed in these communications constitutes a federal offense, so long as the government also presents additional appropriate evidence.

United States v. Bell, 113 F.3d 1345, 1349 (3d Cir. 1997)(internal quotations omitted) (citing United States v. Stansfield, 101 F.3d 909, 918 (3d Cir. 1996). In Bell, the defendant was convicted in federal court for murdering Doreen Proctor. Ms. Proctor had been acting as an informant for the Tri-County Drug Task Force, and had been scheduled to testify against Bell's boyfriend in state court the day of her murder. The Task Force Proctor had been cooperating with was developing evidence for use in federal as well as state court. Bell was initially acquitted of murdering Proctor in state court, but she was thereafter tried and convicted in federal court for witness tampering in violation of 18 U.S.C. S 1512(a)(1)(A) based upon her involvement with Doreen Proctor's murder.

One of her arguments on appeal from her federal conviction was that the evidence was insufficient to establish that she intended to interfere with a federal proceeding. She asserted that the evidence against her showed that Proctor had only been involved in a state investigation and prosecution. Thus, according to Bell, "there was no federal proceeding contemplated at the time of Proctor's murder." Id. at 1348, and she therefore did not interfere with a federal witness within the meaning of S 1512. Bell insisted that, although federal officers had been involved in the Task Force investigation, "there was no evidence that Proctor had been providing information to a federal officer or to an officer authorized to act on behalf of the federal government." Id. Accordingly, we had to determine if the circumstantial evidence was sufficient to

12

allow the jury to conclude that "at least one of the law-enforcement-officer communications that Bell intended to prevent would have been with a federal officer." Id. We held that it was.

In doing so, we relied upon "the statute's clear command that the government need not prove any `state of mind' on the part of the defendant with respect to the federal character of the proceeding or officer." Id. at 1349. We concluded that the statute only requires proof that the "officers with whom the defendant believed the victim might communicate would in fact be federal officers." Id. Similarly, here, the evidence showed that the defendants attempted to influence the testimony available to law enforcement officers. The government did not have to establish that the defendants specifically intended to interfere with a federal investigation. All that S 1512(b)(B)(3) requires is that the government establish that the defendants had the intent to influence an investigation that happened to be federal.

Although we conclude that the prosecution failed to establish a "carjacking" under federal law, that does not necessarily place defendants' conduct beyond the reach of S 1512. In Bell we noted that "[i]f an offense constitutes a federal crime, it is more likely that an officer investigating it would be a federal officer, but an offense's status as a federal crime has no relationship with the defendant's subjective belief about the individual investigating it." Id. at 1349. Similarly, a defendant's subjective state of mind has no relationship to whether or not the government will be able to prove that the defendant's conduct violates a substantive federal law. One who attempts to corruptly influence an investigation takes his or her witnesses and investigations as he or she finds them. Thus, if the investigation or prosecution a defendant tries to hamper turns out to be federal, the witness is guilty of tampering with a federal witness even if the prosecution is unable to establish the facts necessary to establish a violation of federal law. The statute clearly states that it prohibits an attempt to "hinder, . . the communication . . . of information relating to the commission or possible commission," of a federal offense. When the government

13

charges a defendant with violating federal law, but fails to prove the defendant's guilt, a communication about that prosecution or investigation is clearly one that concerns a "possible" violation of federal law.

It is the integrity of the process, and the safety of those involved in it that Congress was seeking to protect in enacting S 1512. A federal prosecution remains federal in character for purposes of the umbrella of S 1512 even if it is in federal court only by accident or mistake. The issue of whether authorities are correct when they select a federal forum over a state forum does not alter the federal nature of the prosecutions brought in federal court insofar as a violation of 18 U.S.C. S 1512 is concerned.

Here, the evidence clearly showed that the defendants attempted to persuade Newton to give false information in an investigation that was prosecuted in federal court. Consequently, we will affirm the convictions for hindering communication of information to a federal officer under 18 U.S.C. S 1512(b)(B)(3).

3. Destruction of Evidence.

18 U.S.C. S 1512(b)(2) provides in pertinent part that it is illegal for anyone to intentionally "alter, destroy, mutilate, or conceal an object with intent to impair the object's integrity or availability for use in an official proceeding." 18 U. S. C. S 1512(b)(2)(B) defines an "official proceeding" as

> a proceeding before a judge or court of the United States, a United States magistrate, a bankruptcy judge, a judge of the United States Tax Court, a special trial judge of the Tax Court, a judge of the United States Claims Court, or a Federal grand jury; . . . .

Here, Count 4 of the superseding indictment charges Romero and Applewhaite with intentionally causing another person to destroy evidence to be used in an official proceeding by persuading someone to paint over the blood that had splattered onto the stone wall in front of Lydia Romero's house. The defendants assert different reasons in arguing that there is insufficient evidence to sustain their convictions for the destruction of evidence.

14

Lydia Romero argues that the government presented absolutely no evidence "that Romero persuaded or attempted to persuade anybody to destroy evidence." Romero's Br. at 25. We disagree. The Hepburns testified that they saw Romero and a young Spanish or Puerto Rican male painting the stone wall on the morning of April 20th. They also testified that the wall had never been painted during the preceding 18 years. Forensic analysis later disclosed blood on the wall and in the soil abutting the wall, and the parties stipulated that it was Eddie Romero's blood. The jury could rely upon that evidence to reasonably conclude that Romero persuaded the young male to paint the wall in order to "impair the [wall's] integrity or availability for use in an official proceeding."

Applewhaite argues that the government has produced no facts from which the jury could reasonably conclude that "their actions might impair an objects (sic) use in a federal proceeding." Applewhaite's Br. at 27. We disagree for the reasons set forth in our discussion of United States v. Bell, Supra. We conclude that the evidence was sufficient to convict both defendants for destruction of evidence under 18 U.S.C. S 1512. The jury could reasonably infer that the defendants persuaded the young male to paint the stone wall in order to destroy evidence to be used in an official proceeding. Consequently, the defendants' convictions for the destruction of evidence will be affirmed.5

_____

5. The government has not produced any evidence by which the jury could reasonably conclude that Applewhaite had any part in specifically persuading the young male to paint the stone wall. Consequently, Applewhaite's liability for the destruction of evidence is co-conspirator's
liability. See Pinkerton v. United States, 328 U. S. 640 (1946). However, Applewhaite does not argue that he cannot be liable as a co-conspirator where there is no evidence of a specific agreement to destroy evidence, and where there is no evidence that he played any part in the commission of the substantive crime of destruction of evidence. Accordingly, we need not decide if the government proved that the destruction of evidence was within the scope of the conspiracy. Id. at 647-48.

15

IV. REVERSAL OF THE CARJACKING CONVICTION
DOES NOT AFFECT THE CONSPIRACY CONVICTION.

Even though we conclude that the prosecution did not
prove the defendant guilty of carjacking –the first alleged
object of the charged conspiracy– we hold that the evidence
was nevertheless sufficient to sustain the defendants'
conviction for conspiracy.

Where three different crimes are alleged as objects of a
conspiracy, a conviction for conspiracy will be upheld if
there is "sufficient circumstantial evidence to prove beyond
a reasonable doubt that [the alleged conspirators]
knowingly and intentionally committed acts furthering any
of the three objects of the conspiracy [absent circumstances
not present here]." United States v. Carr, 25 F.3d 1194,
1201–1202 (3d Cir. 1994) (citing Griffin v. United States,
502 U. S. 465, 56–57 (1991)("[W]hen a jury returns a guilty
verdict on an indictment charging several acts in the
conjunctive, . . . , the verdict stands if the evidence is
sufficient with respect to any one of the acts.") (citation
omitted)). The government met its burden as to the charged
violations of 18 U.S.C. S 1512, and those crimes were
charged as objects of a conspiracy under 18 U.S.C.S 371.
Accordingly, the defendants' conspiracy convictions will be
upheld.

V. TERRITORIAL CONVICTIONS.

A. Attempted First Degree Murder.

Appellants' penultimate argument is that there was
insufficient evidence to support their convictions for
attempted first degree murder and aiding and abetting
under 14 V. I. C. SS 922, 3316 and 11. Applewhaite argues

_____

6. 14 V. I. C. S 331 provides:

    Whoever unsuccessfully attempts to commit an offense, shall,
    unless otherwise specially prescribed by this Code or other law, be
    punished by––

    (1) imprisonment for not more than 25 years, if the offense
    attempted is punishable by imprisonment for life; or

16

that there was insufficient evidence to allow the jury to find premeditation, and Romero argues the evidence was insufficient to allow the jury to conclude that she played any part in the attempted murder of her husband.

Virgin Islands criminal law distinguishes betweenfirst and second degree murder as follows: "All murder which . . . is perpetrated by means of poison, lying in wait, torture or any other kind of wilful, deliberate and premeditated killing . . . is murder in the first degree. . . . All other kinds of murder are murder in the second degree." 14 V. I. C. S 922. As we explained in Government of the Virgin Islands v. Roldan, 612 F.2d 775 (3d Cir. 1979):

> To premeditate a killing is to conceive the design or plan to kill. . . . A deliberate killing is one which has been planned and reflected upon by the accused and is committed in a cool state of the blood, not in sudden passion engendered by just cause of provocation. . .. It is not required, however, that the accused shall have brooded over his plan to kill or entertained it for any considerable period of time. Although the mental processes involved must take place prior to the killing, a brief moment of thought may be sufficient to form a fixed, deliberate design to kill. . . .

Id. at 781 (quoting Government of the Virgin Islands v. Lake, 362 F.2d 770, 776 (3d Cir. 1966). "[A] brief moment of deliberation can suffice," Government of the Virgin Islands v. Charles, 72 F.3d 401, 410 (3d Cir. 1995), to establish the premeditation required for first degree murder. Moreover, the law recognizes the near impossibility of proving one's state of mind by direct evidence. Accordingly, one's mental state is ordinarily determined from the circumstances surrounding a killing. Charles, 72 F.3d at 410 ("premeditation can generally be proved only by circumstantial evidence.")

_____

> (2) in any other case, imprisonment for not more than one-half of the maximum term, or fine of not more than one-half of the maximum sum prescribed by law for the commission of the offense attempted, or by both such fine and imprisonment.

> If premeditation is found it must ordinarily be inferred
> from the objective facts. Every sane man is presumed
> to intend all the natural and probable consequences
> flowing from his deliberate acts. . . . Accordingly, if one
> voluntarily does an act, the direct and natural
> tendency of which is to destroy another's life, it may
> fairly be inferred, in the absence of evidence to the
> contrary, that the destruction of that other's life was
> intended.

Roldan, 612 F.2d at 781 (citation omitted). In addition, under Virgin Islands law one who assists another in the commission of a murder is guilty of aiding and abetting and is viewed in the same light as the principal who actually committed the crime. 14 V. I. C. S 11 provides, in relevant part, as follows:

> (a) Whoever commits a crime or offense or aids, abets,
> counsels, commands, induces or procures its
> commission, is punishable as a principal.

> (b) Whoever willfully causes an act to be done which if
> directly performed by him or another person would be
> a crime or offense, is punishable as a principal.

> (c) Persons within this section shall be prosecuted and
> tried as principals, and no fact need be alleged in the
> information against them other than is required in the
> information against the principal. . . .

Here, the jury inferred that Applewhaite had a premeditated plan to kill Eddie Romero. Given the evidence, the jury could hardly have inferred anything else; and Applewhaite's argument that the evidence was not sufficient to support the jury's conclusion approaches frivolity. After being summoned to his wife's home, Eddie Romero got out of his van and stood unsuspectingly resting against a nearby stone wall with his back to Applewhaite. As Eddie stood in this position facing his wife, Applewhaite snuck up behind him and struck him three times with a baseball bat. Not satisfied with the severe injuries the bat inflicted, Applewhaite thereafter shot Romero at close-range on two separate occasions. As noted above, we fail to see how any reasonable jury could conclude that Applewhaite did not

18

intend to kill Eddie Romero. He clearly had a premeditated plan to do so.[7]

Lydia Romero was part of that plan. In fact, the 847<!>circumstantial evidence, including her relationship to

Eddie, supports an inference that it was her plan to begin with even though Applewhaite was the actual assailant. However, whether the plan was conceived by Applewhaite or Lydia is irrelevant. It is clear that Lydia aided and abetted Applewhaite in his use of force, and she was properly convicted for doing so. Lydia lured Romero to her house so that Applewhaite could attack him from behind, and Applewhaite did just that. When Eddie Romero got out of his van, Lydia Romero was waiting outside in the front yard of her home. She told Eddie Romero to wait outside the stone wall until she penned the dogs; however, she made no move to pen them. Instead, she remained in place, staring at her husband while Applewhaite approached from behind with bat in hand. From these facts, the jury could reasonably conclude that Lydia Romero summoned Eddie to her home and then deliberately diverted her husband's attention so that Applewhaite could ambush him from behind. As noted above, Eddie Romero's survival is due to his good fortune, and the Keystone Cop-like manner in which the defendants executed their plan. However, it is not because Applewhaite and Lydia did not intend to kill him.

Accordingly, the defendants' conviction for attempted first degree murder will be affirmed.

B. Kidnapping.

The Virgin Islands kidnapping statute provides, in relevant part, as follows:

> Whoever without lawful authority confines another person . . . against his will, or confines or inveigles or kidnaps another person, with intent to cause him to be

---

7. Applewhaite argues there is no evidence of premeditation because he claims that he hit Eddie Romero in defense of Lydia Romero and that the shootings were accidental. However, the jury did not believe Applewhaite.

19

> confined or imprisoned . . . against his will . . . is guilty
> of kidnapping . . . .

14 V. I. C. S 1051. Applewhaite argues that the evidence was insufficient to allow the jury to find that Eddie Romero was intentionally confined against his will.

After beating Eddie Romero into unconsciousness, Applewhaite, put Romero's body into Romero's van, and drove away, apparently while wearing latex gloves. When Romero later regained consciousness inside the van he was greeted with bullets from the gun that Applewhaite was holding on him while driving the van. All of this followed a struggle in which Eddie Romero apparently tried to wrest control of the steering wheel and/or gun away from Applewhaite. Applewhaite insists that he did not knowingly confine Romero against his will because his only intent in placing Romero in the van was to take him to the hospital. That of course was a credibility question that the jury resolved against Applewhaite. Apparently, the jury concluded that after clubbing Romero from behind with a baseball bat, slipping into his latex driving gloves then shooting him at point blank range when he regained consciousness; Applewhaite's planned itinerary for Romero did not include the local hospital. That is a reasonable inference.

Lydia Romero argues that there is no evidence from which the jury could conclude that she played any part in kidnapping her husband. Again, we disagree. Romero's liability for the kidnapping is as an aider and abetter. The jury could reasonably find that Applewhaite and Romero's plan included doing something to dispose of Eddie's body after killing him. The jury could further conclude that the "something" that the assailants had decided upon was stuffing Romero into his own van and transporting him away from the front of Lydia's home, and that Lydia's involvement in this scheme certainly furthered Romero's abduction. Indeed, as noted above, she was the one who lured him into position. Moreover, the Hepburns' testimony about hearing Lydia's van drive off and then return certainly an inference that she followed Applewhaite as he took Eddie away, and then gave Applewhaite a ride back to

20

her home after he abandoned the van with Eddie inside of it.

Consequently, we will affirm the defendants' convictions for kidnapping.

VI. CONCLUSION.

To summarize: we will affirm defendants' convictions for the federal charges of conspiracy, hindering the communication of information relating to the commission of a federal offense, and destruction of evidence to be used in an official proceeding. We also affirm the territorial convictions for attempted first degree murder and kidnapping. However, we will reverse the convictions for carjacking and remand for resentencing.[8]

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit

---

8. Originally, Applewhaite was sentenced to a term of incarceration of 60 months on Count 1; 264 months on Count 2; 120 months on Count 3; 120 months on Count 4; 20 years on Count 5 and 10 years on Count 6, with Counts 1, 3 and 4 to run concurrently with Count 2 and Counts 5 and 6 to run concurrently with Counts 1, 2, 3 and 4. Romero was sentenced to 60 months on Count 1; 300 months on Count 2; 120 months on Count 3; 120 months on Count 4; 20 years on Count 5; and 10 years on Count 6 with Counts 1, 3 and 4 to run concurrently with Count 2 and Counts 5 and 6 to run concurrently with Counts 1, 2, 3 and 4.