**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 20-1422
_____


UNITED STATES OF AMERICA
v.
SAFEHOUSE, a Pennsylvania nonprofit corporation;
JOSÉ BENITEZ, as President and Treasurer of Safehouse

*******************

SAFEHOUSE, a Pennsylvania nonprofit corporation
v.
U.S. DEPARTMENT OF JUSTICE;
WILLIAM P. BARR, in his official capacity
as Attorney General of the United States; and
WILLIAM M. MCSWAIN, in his official capacity as
U.S. Attorney for the Eastern District of Pennsylvania

United States of America, U.S. Department of Justice,
United States Attorney General William P. Barr, and
the United States Attorney for the Eastern District of
Pennsylvania William M. McSwain,
                                        Appellants

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 2:19-cv-00519)
District Judge: Honorable Gerald A. McHugh

_____

Argued: November 16, 2020

Before: AMBRO, BIBAS, and ROTH, *Circuit Judges*

(Filed: January 12, 2021)
_____


William M. McSwain          [ARGUED]
Gregory B. David
John T. Crutchlow
Bryan C. Hughes
Erin E. Lindgren
Office of United States Attorney
615 Chestnut Street
Suite 1250
Philadelphia, PA 19106

    *Counsel for Appellants*

Ronda B. Goldfein
Yolanda F. Lollis
Adrian M. Lowe
AIDS Law Project of Pennsylvania
1211 Chestnut Street
Suite 600
Philadelphia, PA 19107

Ilana H. Eisenstein                    [ARGUED]
Courtney G. Saleski
Megan E. Krebs
Ben C. Fabens-Lassen
DLA Piper
1650 Market Street
One Liberty Place, Suite 5000
Philadelphia, PA 19103

Peter Goldberger
50 Rittenhouse Place
Ardmore, PA 19003

Seth F. Kreimer
University of Pennsylvania School of Law
3501 Chestnut Street
Philadelphia, PA 19104

 *Counsel for Appellees*

James G. Mann
Pennsylvania House of Representatives
P.O. Box 202228
Suite B-6 Main Capitol
Harrisburg, PA 17120

*Counsel for Amici in support of Appellants Republican Caucus of the Pennsylvania House of Representatives and Republican Caucus of the Senate of Pennsylvania*

John M. Gore
Jones Day
51 Louisiana Avenue, N.W.
Washington, D.C. 20001

*Counsel for Amici in support of Appellants Pat Toomey, Brian Fitzpatrick, Tom Cotton, John Joyce, Fred Keller, Mike Kelly, Daniel P. Meuser, Scott Perry, Guy Reschenthaler, Lloyd Smucker, and Glenn Thompson*

Jeffrey M. Harris
Consovoy McCarthy
1600 Wilson Boulevard, Suite 700
Arlington, VA 22209

*Counsel for Amici in support of Appellants Drug Policy Scholars and Former Government Officials*

Michael H. McGinley
Justin M. Romeo
Dechert
2929 Arch Street
18th Floor, Cira Centre
Philadelphia, PA 19104

*Counsel for Amici in support of Appellants 20 Neighbor-hood Civic Associations and the Fraternal Order of Police Lodge 5*

Loren L. AliKhan
Office of Attorney General of District of Columbia
Office of the Solicitor General
400 6th Street, N.W., Suite 8100
Washington, D.C. 20001

*Counsel for Amici in support of Appellees District of Columbia, State of California, State of Delaware, State of Illinois, State of Michigan, State of Minnesota, State of New Mexico, State of Oregon, State of Vermont, and State of Virginia*

Trevor C. Burrus
Cato Institute
1000 Massachusetts Avenue, N.W.
Washington, D.C. 20001

*Counsel for Amici in support of Appellees Cato Institute, American Civil Liberties Union, and American Civil Lib-erties Union of Pennsylvania*

Ezekiel R. Edwards
American Civil Liberties Union
125 Broad Street, 18th Floor
New York, New York 10004

*Counsel for Amicus in support of Appellees American Civil Liberties Union*

Mary Catherine Roper
American Civil Liberties Union of Pennsylvania
P.O. Box 60173
Philadelphia, PA 19102

*Counsel for Amicus Appellee American Civil Liberties Union of Pennsylvania*

Michael J. Engle
Buchanan Ingersoll & Rooney
50 South 16th Street
Two Liberty Place, Suite 3200
Philadelphia, PA 19102

*Counsel for Amici in support of Appellees Dr. Alexis M. Roth, Dr. Stephen E. Lankenau, and 5th Square*

Virginia A. Gibson
Hogan Lovells US
1735 Market Street, 23rd Floor
Philadelphia, PA 19103

*Counsel for Amici in support of Appellees King County Washington, City of New York, City of Seattle, City and County of San Francisco, and City of Pittsburgh*

Ellen C. Brotman
Suite 1500
One South Broad Street
Philadelphia, PA 19107

*Counsel for Amici in support of Appellees AIDS United, American Medical Association, Association for Multidisciplinary Education and Research in Substance Use and Addiction, Association of Schools and Programs of Public Health, California Society of Addiction Medicine, Drug Policy Alliance, Foundation for AIDS Research, Harm Reduction Coalition, National Alliance of State and Territorial AIDS Directors, Network for Public Health, Pennsylvania Medical Society, Philadelphia County Medical Society, Positive Womens Network, Treatment Action Group, and Vital Strategies*

Michael D. LiPuma
Law Firm of Justin F. Robinette
Suite 1109
325 Chestnut Street
Philadelphia, PA 19106

*Counsel for Amici in support of Appellees Homeless Advocacy Project, Pathways to Housing Pennsylvania, Catholic Worker Free Clinic, Bethesda Project Inc., and St. Francis Inn*

7

Jennifer MacNaughton
City of Philadelphia
Law Department
1515 Arch Street
Philadelphia, PA 19102

*Counsel for Amici in support of Appellees Mayor Jim Kenney and Dr. Thomas Farley*

Brian T. Feeney
Jessica Natali
Kevin Rethore
Greenberg Traurig
1717 Arch Street, Suite 400
Philadelphia, PA 19103

*Counsel for Amici in support of Appellees Philadelphia Area Community Organizations*

Mark C. Fleming
Wilmer Cutler Pickering Hale & Dorr
60 State Street
Boston, MA 02109

Daniel Segal
Matthew A. Hamermesh
Hangley Aronchick Segal Pudlin & Schiller
One Logan Square
18th & Cherry Streets, 27th Floor
Philadelphia, PA 19103

*Counsel for Amici in support of Appellees Current and Former Prosecutors, Law Enforcement Leaders, and Former Department of Justice Official and Leaders*

Catherine M. Recker
Welsh & Recker
306 Walnut Street
Philadelphia, PA 19106

*Counsel for Amicus in support of Appellees Professor Randy Barnett*

Mira E. Baylson
Cozen O'Connor
1650 Market Street
One Liberty Place, Suite 2800
Philadelphia, PA 19103

*Counsel for Amici in support of Appellees Religious Leaders in Philadelphia and Beyond*

Thomas A. Leonard, IV
Cozen O'Connor
1650 Market Street
One Liberty Place, Suite 2800
Philadelphia, PA 19103

*Counsel for Amici in support of Appellees Friends and Family of Victims of Opioid Addiction*

_____

OPINION OF THE COURT
_____

BIBAS, *Circuit Judge*.

Though the opioid crisis may call for innovative solutions, local innovations may not break federal law. Drug users die every day of overdoses. So Safehouse, a nonprofit, wants to open America's first safe-injection site in Philadelphia. It favors a public-health response to drug addiction, with medical staff trained to observe drug use, counteract overdoses, and offer treatment. Its motives are admirable. But Congress has made it a crime to open a property to others to use drugs. 21 U.S.C. § 856. And that is what Safehouse will do.

Because Safehouse knows and intends that its visitors will come with a significant purpose of doing drugs, its safe-injection site will break the law. Although Congress passed § 856 to shut down crack houses, its words reach well beyond them. Safehouse's benevolent motive makes no difference. And even though this drug use will happen locally and Safehouse will welcome visitors for free, its safe-injection site falls within Congress's power to ban interstate commerce in drugs.

Safehouse admirably seeks to save lives. And many Americans think that federal drug laws should move away from law enforcement toward harm reduction. But courts are not arbiters of policy. We must apply the laws as written. If the laws are unwise, Safehouse and its supporters can lobby Congress to

carve out an exception. Because we cannot do that, we will reverse and remand.

## I. BACKGROUND

### A. The federal drug laws

Drug addiction poses grave social problems. The opioid crisis has made things worse: more than a hundred Americans die every day of an overdose. Dep't of Health & Human Servs., Office of the Surgeon General, *Facing Addiction in America: The Surgeon General's Spotlight on Opioids* 1 (2018). People of good will disagree about how to tackle these enormous problems. Lawmakers and prosecutors have traditionally used criminal prosecution to try to stem the flow, targeting the supply and hoping to curb demand. Others emphasize getting users into rehab. Harm-reduction proponents favor treating drug users without requiring them to abstain first. Still others favor decriminalizing or even legalizing drugs. There is no consensus and no easy answer.

But our focus is on what Congress has done, not what it should do. Congress has long recognized that illegal drugs "substantial[ly]" harm "the health and general welfare of the American people." 21 U.S.C. § 801(2). Indeed, half a century ago, Congress tackled this national problem by consolidating scattered drug laws into a single scheme: the Comprehensive Drug Abuse Prevention and Control Act of 1970. Pub. L. 91-513, 84 Stat. 1236 (codified as amended at 21 U.S.C. §§ 801–971); *see Gonzales v. Raich*, 545 U.S. 1, 10–12 (2005). To this day, this scheme governs the federal approach to illegal drugs.

Title II of that law, the Controlled Substances Act, broadly regulates illegal drugs. The Act spells out many crimes. A person may not make, distribute, or sell drugs. 21 U.S.C. §841. He may not possess them. §844. He may not take part in a drug ring. §848. He may not sell drug paraphernalia. §863. He may not conspire to do any of these banned activities. §846. And he may not own or maintain a "drug-involved premises": a place for using, sharing, or producing drugs. §856.

This last crime—the one at issue—was added later. At first, the Act said nothing about people who opened their property for drug activity. Then, the 1980s saw the rise of crack houses: apartments or houses (often abandoned) where people got together to buy, sell, use, or even cook drugs. *See United States v. Lancaster*, 968 F.2d 1250, 1254 n.3 (D.C. Cir. 1992). These "very dirty and unkempt" houses blighted their neighborhoods, attracting a stream of unsavory characters at all hours. *Id.* But it was hard to shut crack houses down. To go after owners, police and prosecutors tried to cobble together conspiracy and distribution charges. *See, e.g.*, *United States v. Jefferson*, 714 F.2d 689, 691–92 (7th Cir. 1983), *vacated on other grounds*, 474 U.S. 806 (1985). But no law targeted the owner or maintainer of the premises.

To plug this gap, Congress added a new crime: 21 U.S.C. §856. Anti-Drug Abuse Act of 1986, Pub. L. No. 99-570, §1841, 100 Stat. 3207, 3207–52. This law banned running a place for the purpose of manufacturing, selling, or using drugs. Congress later extended this crime to reach even temporary drug premises and retitled it from "Establishment of manufacturing operations" to "Maintaining drug-involved premises."

12

*Compare* 21 U.S.C. § 856(a) & caption (2003) *with* 21 U.S.C. § 856(a) & caption (1986). After all, the statute covers much more than manufacturing drugs.

### B. Safehouse's safe-injection site

The parties have stipulated to the key facts: Safehouse wants to try a new approach to combat the opioid crisis. It plans to open the country's first safe-injection site. Safehouse is headed by José Benitez, who also runs Prevention Point Philadelphia. Like Prevention Point and other sites, Safehouse will care for wounds, offer drug treatment and counseling, refer people to social services, distribute overdose-reversal kits, and exchange used syringes for clean ones.

But unlike other sites, Safehouse will also feature a consumption room. Drug users may go there to inject themselves with illegal drugs, including heroin and fentanyl. The consumption room is what will make Safehouse unique—and legally vulnerable.

When a drug user visits the consumption room, a Safehouse staffer will give him a clean syringe as well as strips to test drugs for contaminants. Staffers may advise him on sterile injection techniques but will not provide, dispense, or administer any controlled drugs. The user must get his drugs before he arrives and bring them to Safehouse; he may not share or trade them on the premises. The drugs he consumes will be his own.

After he uses them, Safehouse staffers will watch him for signs of overdose. If needed, they will intervene with medical care, including respiratory support and overdose-reversal

agents. Next, in an observation room, counselors will refer the visitor to social services and encourage drug treatment.

Safehouse hopes to save lives by preventing diseases, counteracting drug overdoses, and encouraging drug treatment. It believes that visitors are more likely to accept counseling and medical care "after they have consumed drugs and are not experiencing withdrawal symptoms." App. 685.

### C. Procedural history

The Government sought a declaratory judgment that Safehouse's consumption room would violate §856(a)(2). Safehouse counterclaimed for a declaratory judgment that it would not and that applying the statute to Safehouse would violate either the Commerce Clause or the Religious Freedom Restoration Act (RFRA). U.S. Const. art. I, §8, cl. 3; 42 U.S.C. §§2000bb–2000bb-3.

The Government moved for judgment on the pleadings, and the District Court denied the motion. It held that §856(a)(2) does not apply to Safehouse's proposed consumption room. *United States v. Safehouse*, 408 F. Supp. 3d 583, 587 (E.D. Pa. 2019). Rather, it held that someone violates §856(a)(2) only if *his* purpose is for others to manufacture, distribute, or use illegal drugs on the premises. *Id.* at 595, 605. And it found that Safehouse's purpose was to offer medical care, encourage treatment, and save lives, not to facilitate drug use. *Id.* at 614. Because the statute did not apply, the court did not need to reach Safehouse's Commerce Clause or RFRA defenses. After the parties stipulated to a set of facts, the court entered a final declaratory judgment for Safehouse. The Government now

14

appeals. On appeal, Safehouse renews its Commerce Clause defense but reserves its RFRA defense for remand.

We have jurisdiction to hear this appeal. The District Court's declaratory judgment has "the force and effect of a final judgment." 28 U.S.C. § 2201. "Once [the] district court has ruled on all of the issues submitted to it, either deciding them or declining to do so, the declaratory judgment is complete, final, and appealable." *Henglein v. Colt Indus. Operating Corp.*, 260 F.3d 201, 211 (3d Cir. 2001). So it does not matter that the court did not reach the affirmative defenses. We review the court's reading of the statute and application of the statute to Safehouse de novo. *Rotkiske v. Klemm*, 890 F.3d 422, 424 n.2 (3d Cir. 2018) (en banc), *aff'd*, 140 S. Ct. 355 (2019).

## II. SAFEHOUSE WILL VIOLATE 21 U.S.C. § 856(a)(2) BY KNOWINGLY AND DELIBERATELY LETTING VISITORS USE DRUGS

Section 856(a)(2) makes it illegal to "manage or control" a property and then "knowingly and intentionally" open it to visitors "for the purpose of … using a controlled substance":

**(a) Unlawful acts**

Except as authorized by this subchapter, it shall be unlawful to—

> (1) knowingly open, lease, rent, use, or maintain any place, whether permanently or temporarily, for the purpose of manufacturing, distributing, or using any controlled substance;

(2) manage or control any place, whether permanently or temporarily, either as an owner, lessee, agent, employee, occupant, or mortgagee, and knowingly and intentionally rent, lease, profit from, or make available for use, with or without compensation, the place *for the purpose of* unlawfully manufacturing, storing, distributing, or using a controlled substance.

21 U.S.C. § 856(a) (emphasis added). This case turns on how to construe and apply § 856(a)(2)'s last phrase: "for the purpose of … ." Safehouse insists that, to violate that paragraph, Safehouse itself would need to have the purpose that its visitors use drugs. The Government disagrees. It argues that only the visitors need that purpose; Safehouse just needs to intentionally open its facility to visitors it knows will use drugs there.

We agree with the Government. To break the law, Safehouse need only "knowingly and intentionally" open its site to visitors who come "for the purpose of … using" drugs. The text of the statute focuses on the third party's purpose, not the defendant's. Even if we read paragraph (a)(2) as Safehouse does, its purpose *is* that the visitors use drugs. That is enough to violate paragraph (a)(2).

## A. Under § 856(a)(2), the defendant must knowingly and deliberately let another person use his property for drug activity.

Before getting to the disputed requirement of "purpose," we must first discuss the statute's two other mental states, neither of which is really in dispute. To violate (a)(2), a defendant must

16

"knowingly and intentionally … make [his property] available for use" by a third party for that person's illegal drug use. The first two phrases of (a)(2) focus on the voluntary conduct or knowledge of the defendant. The first phrase requires the defendant to "manage or control [a] place." And the second phrase requires the defendant to "knowingly and intentionally rent, lease, profit from, or make [the place] available for use" for illegal drug activity. The adverbs "knowingly" and "intentionally" introduce this second phrase, modifying the defendant's making the place available to a third party. In practice, this means three things.

*First*, the defendant must know that other(s) are or will be manufacturing, storing, distributing, or using drugs on his property. *See United States v. Barbosa*, 271 F.3d 438, 457–58 (3d Cir. 2001). For instance, the owner of a building cannot be prosecuted if he does not know that others are selling drugs out of his building. But the defendant cannot just turn a blind eye to rampant drug activity. *See United States v. Ramsey*, 406 F.3d 426, 431–32 (7th Cir. 2005). Other courts hold that the owner's willful blindness or deliberate ignorance can suffice. *See, e.g.*, *United States v. Chen*, 913 F.2d 183, 192 & n.11 (5th Cir. 1990).

*Second*, the defendant need know only that his tenants or customers are selling or using heroin, fentanyl, cocaine, or the like. He does not need to know that they are violating the law or intend for them to do so. *See Bryan v. United States*, 524 U.S. 184, 192–93 (1998); *Barbosa*, 271 F.3d at 457–58. "[I]gnorance of the law generally is no defense to a criminal charge." *Ratzlaf v. United States*, 510 U.S. 135, 149 (1994). Of

17

course, Congress can make it a defense. *Id.* But it does so sparingly, almost exclusively for tax and regulatory crimes. *See Cheek v. United States*, 498 U.S. 192, 199–200 (1991) (tax crimes); *Liparota v. United States*, 471 U.S. 419, 426 (1985) (misusing food stamps). And when Congress does require knowledge of the law, it uses the word "willfully." *Bryan*, 524 U.S. at 191–92 & n.13; *Ratzlaf*, 510 U.S. at 141–42 (equating willfulness with "a purpose to disobey the law"). It did not do so here.

*Finally*, the defendant must make the place available to others "intentionally." That means deliberately, not accidentally or by mistake. *Barbosa*, 271 F.3d at 458. Because paragraph (a)(2) predicates liability on a third party's drug activities, it adds this extra intent requirement to shield owners who are not complicit. An owner is not liable, for instance, if he knows that trespassers are doing drugs but did not invite them and does not want them.

## B. Under §856(a)(2), the defendant need not have the *purpose* of drug activity

While (a)(2) requires the defendant to act knowingly and intentionally, it does not require him to also have another mental state: "purpose." Paragraph (a)(2) requires *someone* to have a "purpose"—but not the defendant. To get a conviction under (a)(2), the government must show only that the defendant's *tenant or visitor* had a purpose to manufacture, distribute, or use drugs. This conclusion follows from the law's language and grammar. It avoids making paragraph (a)(2) redundant of (a)(1). It also avoids making (a)(2)'s intent requirement

18

redundant. And it is the conclusion reached by every circuit court to consider the issue.

1. *The plain text requires only that the* third party *have the purpose of drug activity*. Section 856's text makes it clear that (a)(2)'s "purpose" is not the defendant's. We see this from the way that paragraphs (a)(1) and (a)(2) are written and structured.

i. *Paragraph (a)(1)*. The Government does not charge Safehouse with violating paragraph (a)(1). But to understand its sibling, paragraph (a)(2), we must start with (a)(1):

[I]t shall be unlawful to—

> (1) *knowingly* open, lease, rent, use, or maintain any place, whether permanently or temporarily,
>
> *for the purpose of* manufacturing, distributing, or using any controlled substance.

21 U.S.C. § 856(a)(1) (line break added; mens rea terms italicized). This paragraph *requires* just one actor and two sets of actions. The actor is the defendant. He "open[s], lease[s], rent[s], use[s], or maintain[s] [the] place." He also has "the purpose of manufacturing, distributing, or using" the drugs. These actions do not require a third party. A person can "maintain" an apartment or "manufactur[e]" drugs all by himself. Yet this paragraph does not *forbid* third parties. A defendant does not have to act alone; he can "us[e]" drugs with a friend or "manufactur[e]" them with a business partner. He can even have his employees do that work for him; a kingpin can run a drug

19

empire without ever touching the drugs himself. But even if no one joins him in his drug activities, he still falls under (a)(1). The inquiry turns on the purpose of the defendant.

So paragraph (a)(1) bars a person from operating a place for his own purpose of illegal drug activity. On this, the parties, the District Court, and our sister circuits all agree. For instance, a person may not use his bedroom as the base of his drug dealing operation. *See United States v. Verners*, 53 F.3d 291, 296–97 (10th Cir. 1995). He may not manufacture meth in his garage and regularly invite others over to use meth in that garage. *See United States v. Shetler*, 665 F.3d 1150, 1163–64 (9th Cir. 2011). And he certainly may not rent houses to serve as drug distribution centers by day and house his street-level drug dealers by night. *See United States v. Clavis*, 956 F.2d 1079, 1083–85, 1090–94 (11th Cir. 1992).

ii. *Paragraph (a)(2)*. Now we turn to paragraph (a)(2):

[I]t shall be unlawful to—

> …

> (2) manage or control any place, whether permanently or temporarily, either as an owner, lessee, agent, employee, occupant, or mortgagee, and

> *knowingly and intentionally* rent, lease, profit from, or make available for use, with or without compensation, the place

> *for the purpose of* unlawfully manufacturing, storing, distributing, or using a controlled substance.

20

21 U.S.C. § 856(a)(2) (line breaks added; mens rea terms italicized). The District Court read this paragraph, like paragraph (a)(1), to require that the defendant act for *his own* purpose of illegal drug activity. But paragraph (a)(2) does not require such a high mental state (mens rea). Instead, the defendant need only deliberately make his place available to another, knowing that *this other person* has the purpose of illegal drug activity.

Unlike paragraph (a)(1), paragraph (a)(2) contemplates at least two actors: a defendant and a third party. The defendant "manage[s] or control[s]" the place, whether "as an owner, lessee, agent, employee, occupant, or mortgagee." He could be a landlord, a business owner, or a renter.

The second actor is some third party: a tenant, a customer, or a guest. She is the one who uses or occupies the place. The law does not mention this third party, but its verbs require her. The landlord must "rent" or "lease" the place out to a tenant. For the business owner to "profit from" the place, customers must pay him. If a defendant "make[s] [the place] available for use," someone must be there to use it.

In turn, that third party engages in the drug activity. Paragraph (a)(2) lays out three sets of actions, corresponding to the three phrases broken out separately above. The defendant does the first two: he "manage[s] or control[s]" the place, and he "rent[s], lease[s], profit[s] from, or make[s] [it] available for use." The third party does the last set of actions: she "manufacture[s], stor[es], distribut[es], or us[es] a controlled substance" (or at least has the purpose to do so). For instance, the tenant, not the landlord, sells drugs out of the apartment.

21

This third party, we hold, is the one who must act "for the purpose of" illegal drug activity. The parties vigorously contest this point. But this reading is logical. Paragraph (a)(1) requires just the defendant. He must have the purpose of drug activity, whether he engages in it by himself or with others. Paragraph (a)(2) requires at least two people, adding the third party. She performs the drug activity. The phrase "for the purpose of" refers to this new person.

Thus, a defendant cannot let a friend use his house to weigh and package drugs, even if the defendant himself is not involved in the drug ring. *See United States v. McCullough*, 457 F.3d 1150, 1157–58, 1161 (10th Cir. 2006). He cannot tell his son to stop selling drugs from his trailer, yet let him stay even when he keeps selling. *See Ramsey*, 406 F.3d at 429, 433. And he cannot lease storefronts to known drug dealers just because he needs the money. *See United States v. Cooper*, 966 F.2d 936, 938 (5th Cir. 1992).

2. *Safehouse's interpretation would make paragraph (a)(2) and "intentionally" redundant.* Together, paragraphs (a)(1) and (a)(2) compose a coherent package, forbidding different ways of "[m]aintaining [a] drug-involved premises." 21 U.S.C. § 856 (caption). Each paragraph sets out a distinct crime, separated by a paragraph number, spacing, and a semicolon. *United States v. Rigas*, 605 F.3d 194, 209 (3d Cir. 2010) (en banc). Each requires a different actor to have the required purpose.

Safehouse's reading, by contrast, would make paragraph (a)(2) redundant of (a)(1). In each, Safehouse says, the defendant himself must have the purpose of drug activity. It concedes

22

that the paragraphs partly overlap. But it argues that (a)(1) covers the crack house's operator, while only (a)(2) covers a "distant landlord." Oral Arg. Tr. 63. This distinction does not hold. If each paragraph required just one actor who has the purpose of drug activity, the distant landlord would fall under either. Safehouse admits that he violates (a)(2). He is guilty under (a)(1) too, because he has "rent[ed]" and "maintain[ed]" a place for drug activity. Nothing would differentiate (a)(2) from (a)(1).

Safehouse's other example to distinguish the two paragraphs fares no better. It postulates an owner who lets her boyfriend run a crack ring from her apartment while she is at work. It says she would violate only (a)(2). Not so. If she does not have the purpose of using the apartment for drug sales, Safehouse's reading would exclude her from either paragraph. But if she does have that purpose, she would be liable under both.

Thus, on Safehouse's reading, (a)(2) would do no independent work. Recall that a defendant can just as easily violate (a)(1) while working with someone else. Both paragraphs would require the defendant to have the requisite purpose, so (a)(2) would add nothing. That redundancy is fatal. Though statutes sometimes overlap, we try to avoid reading one part of a statute to make another part surplusage. *Yates v. United States*, 574 U.S. 528, 543 (2015). That is especially true of two paragraphs nestled in the same subsection. *Id.* We will not collapse the two into one.

Safehouse's reading would also make paragraph (a)(2)'s intent requirement redundant of its purpose requirement.

Congress added the word "intentionally" to paragraph (a)(2) but not (a)(1). Intention, like purpose, is a volitional mental state; it requires the defendant to will something. One cannot have a purpose of unlawful drug activity without intending that activity. In paragraph (a)(2), the intent requirement would make no sense layered on top of requiring the defendant to have the purpose. But it makes sense to require the defendant's intent on top of the *third party's* purpose. That protects defendants against liability for mistaken, accidental, or involuntary use of their property.

3. *Other circuits read § 856(a) similarly*. Finally, six other circuits agree with our reading of the two paragraphs. *See United States v. Wilson*, 503 F.3d 195, 197–98 (2d Cir. 2007) (per curiam); *United States v. Chen*, 913 F.2d 183, 189–90 (5th Cir. 1990); *United States v. Banks*, 987 F.2d 463, 466 (7th Cir. 1993); *United States v. Tebeau*, 713 F.3d 955, 959–61 (8th Cir. 2013); *United States v. Tamez*, 941 F.2d 770, 774 (9th Cir. 1991); *United States v. Verners*, 53 F.3d 291, 296–97 & n.4 (10th Cir. 1995). No circuit has held otherwise.

True, as Safehouse notes, no other circuit has addressed a safe-injection site. The other circuits' cases involved egregious drug activity. But these cases all recognize the textual difference between the defendant's own purpose under paragraph (a)(1) and the third party's purpose under (a)(2). Safehouse has much better intentions. But good intentions cannot override the plain text of the statute.

4. *Safehouse's other arguments are unpersuasive.* Safehouse raises three objections to the plain reading of the text, but they all fail. First, it responds that "for the purpose of"

24

cannot mean two different things in the two sister paragraphs. It does not. We presume that "purpose" means the same thing in both. *Env't Def. v. Duke Energy Corp.*, 549 U.S. 561, 574 (2007). But we do not presume that the "purpose" belongs to the same *actor* in each paragraph.

The difference in phrasing draws that distinction. For instance, paragraph (a)(1) forbids a defendant's "use" of a place "for the purpose of" drug activity. Paragraph (a)(2) forbids a defendant's "mak[ing] [a place] available for use … for the purpose of" drug activity. In each subsection, "for the purpose of" refers back to "use," its nearest reasonable referent. *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 152–53 (2012). Whoever "use[s]" the property is the one who must have the purpose. Since the third party is the actor who "use[s]" the place in paragraph (a)(2), it is her purpose that matters. Those two phrases are worded differently because they target use by different actors.

Second, Safehouse fares no better by citing the rule of lenity. We interpret ambiguities in criminal statutes in favor of the defendant. *Liparota*, 471 U.S. at 427. Before we do, though, we must exhaust the traditional tools of statutory construction. *Shular v. United States*, 140 S. Ct. 779, 787 (2020). And once we do that, this statutory text is clear enough, not "grievous[ly] ambigu[ous]." *United States v. Castleman*, 572 U.S. 157, 173 (2014) (quoting *Barber v. Thomas*, 560 U.S. 474, 488 (2010)).

Finally, Safehouse objects that it would be "extremely odd" to tie a defendant's liability to a third party's state of mind. Oral Arg. Tr. 61. That is not so strange. When a robber holds up a cashier with a toy gun, the prosecution must prove that the

cashier had a real "fear of injury." 18 U.S.C. § 1951(b)(1). Or in a kidnapping case, to show that the defendant acted "unlawfully," the prosecution must prove that the victim did not consent to come along. 18 U.S.C. § 1201(a). And when one member of a drug ring goes astray and kills someone, his coconspirators can still be liable for murder. *Pinkerton v. United States*, 328 U.S. 640, 645–47 (1946). Though only the killer has the requisite specific intent to kill, it is enough that his partners in crime could reasonably foresee that he would kill in furtherance of the conspiracy. *United States v. Gonzales*, 841 F.3d 339, 351–52 (5th Cir. 2016); *United States v. Alvarez*, 755 F.2d 830, 848–49 (11th Cir. 1985).

In sum, all that paragraph (a)(2) requires is that the third party, not the defendant, have the purpose of drug activity. Still, the defendant must have a mental state: he must knowingly and willingly let others use his property for drug activity. Now we apply this statute to Safehouse.

## C. Section 856(a)(2) applies to Safehouse because its visitors will have a significant purpose of drug activity

Everyone agrees that Safehouse satisfies the first two phrases of paragraph (a)(2). First, it will "manage [and] control" the site. Second, it will "intentionally … make [its consumption room] available for [visitors'] use," knowing that they will use drugs there. But visitors will come for other reasons too, including Safehouse's medical and counseling services. So the question is whether the visitors' use of the consumption room will satisfy the third phrase: (a)(2)'s purpose requirement. It will.

26

A person's purpose is his "objective, goal, or end." *Purpose*, *Black's Law Dictionary* (11th ed. 2019). It is something he "sets out to do." *Purpose* (def. 1a), *Oxford English Dictionary* (3d ed. 2007).

People often have multiple purposes. A parent might scold a screaming child *both* to silence her *and* to teach her how to behave in public. But not every purpose satisfies the statute. The statute requires the actor to act "for *the* purpose of" drug activity, not just *a* purpose of drug activity. 21 U.S.C. §856(a) (emphasis added). That choice of "the" rather than "a" means that not just any purpose will do. The actor's purpose must be more than "merely incidental." *Lancaster*, 968 F.2d at 1253. But it need not be his "*sole* purpose." *Shetler*, 665 F.3d at 1161. Otherwise, Congress would have said "for the sole purpose," as it has elsewhere. *E.g.*, 18 U.S.C. §48(d)(2)(B); 15 U.S.C. §62; 17 U.S.C. §1201(d)(1).

Since the actor's purpose must fall somewhere between an "incidental" and a "sole" purpose, we think the District Court and our sister circuits have it right: the actor need have only a "significant purpose" of drug activity. *United States v. Russell*, 595 F.3d 633, 643 (6th Cir. 2010). If he has a "significant purpose" of drug use, he violates the statute, even if he also has *other* significant purposes. *United States v. Soto-Silva*, 129 F.3d 340, 342, 347 (5th Cir. 1997).

Safehouse's visitors will have the significant purpose of drug activity. True, some people will visit Safehouse just for medical services or counseling. Even so, Safehouse's main attraction is its consumption room. Visitors will bring their own drugs to use them there. And many of Safehouse's services will

revolve around the visitors' drug use there. The clean syringes and fentanyl strips will let them inject drugs more securely. The respiratory support and overdose-reversal agents will reduce their chances of dying of an overdose. And the medical and counseling care will be offered after they have used drugs. When a visitor comes to Safehouse to prevent an overdose, that reason is bound up with the significant purpose of doing drugs. That satisfies the statute.

Safehouse worries that our reading will punish parents for housing their drug-addicted children, or homeless shelters for housing known drug users. It will not. People use these places to eat, sleep, and bathe. The drug use in homes or shelters would be incidental to living there. But for most people, using drugs at Safehouse will not be incidental to going there. It will be a significant purpose of their visit.

## D. In any event, Safehouse has a significant purpose that its visitors do drugs

Even if paragraph (a)(2) looked to Safehouse's own purpose, Safehouse would violate the statute. For Safehouse itself has a significant purpose that its visitors use heroin, fentanyl, and the like.

Safehouse vigorously contests this point. As it stresses, *one* of Safehouse's purposes is to stop overdoses and save lives. Other purposes include preventing disease and providing medical care. But as Safehouse conceded at oral argument, "there can be multiple purposes" that a defendant pursues at once. Oral Arg. Tr. 53. Plus, motive is distinct from mens rea. A defendant can be guilty even if he has the best of motives. A child

who steals bread to feed his hungry sister has still committed theft. The son who helps his terminally ill mother end her life has still committed murder.

One of Safehouse's significant purposes is to allow drug use. Start with the facility's name: Safehouse calls it a "consumption room" or "safe-injection site." App. 683–84. It expects visitors to bring heroin, fentanyl, or the like with them to use on-site. It will offer visitors clean syringes and fentanyl strips and advise visitors on how to inject heroin or fentanyl safely. Safehouse even foresees a benefit to this on-site drug use: it thinks visitors will be more likely to accept drug treatment "after they have consumed drugs and are not experiencing withdrawal symptoms." App. 685.

In short, Safehouse will offer visitors a space to inject themselves with drugs. Even on its own reading of purpose, that is enough to violate the statute.

### E.  We cannot rewrite the statute to exclude the safe-injection site

Finally, Safehouse asks us to look beyond the statute's text to consider Congress's intent. The public-policy debate is important, but it is not one for courts. If the text of a criminal statute "is plain … the sole function of the courts is to enforce it according to its terms." *Caminetti v. United States*, 242 U.S. 470, 485 (1917).

1. *We apply the plain text, not Congress's expectations.* First, Safehouse objects that Congress targeted crack houses, but never expected the law to apply to safe-injection sites. That is true but irrelevant. *See Pa. Dep't of Corrs. v. Yeskey*, 524

U.S. 206, 212 (1998). Statutes often reach beyond the principal evil that animated them. *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 79 (1998). For instance, though Congress meant RICO to target mobsters, it reaches far beyond them to legitimate businesses as well. *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 499 (1985) (analyzing the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961–68).

A court's job is to parse texts, not psychoanalyze lawmakers. "[W]e do not inquire what the legislature meant; we ask only what the statute means." *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1631 (2018) (internal quotation marks omitted) (quoting Justice Jackson quoting Justice Holmes). At least when the text is clear, we will not look beyond it to lawmakers' statements, because "legislative history is not the law." *Id.*; *accord Pellegrino v. TSA*, 937 F.3d 164, 179 (3d Cir. 2019) (en banc). The words on the page, not the intent of any legislator, go through bicameralism and presentment and become law. Here, the statute's plain text covers safe-injection sites. We look no further.

2. *Congress's recent efforts to combat addiction did not revoke the statute.* Next, Safehouse and its amici claim that our reading of the statute is bad policy. On average, nearly three Philadelphians die of drug overdoses each day. A consumption room, they argue, could save those lives. And the Government has spent lots of time and money fighting the opioid crisis. In 2016, Congress passed the Comprehensive Addiction and Recovery Act, which creates federal grants to treat drug addiction and prevent overdoses. Pub. L. No. 114-198, § 103, 130 Stat. 695, 699–700 (codified at 21 U.S.C. § 1536). Since then, it has

30

banned federal funding of syringe-exchange programs but authorized an exception. Consolidated Appropriations Act of 2016, Pub. L. No. 114-113, §520, 129 Stat. 2242, 2652.

Safehouse asks us to read the Act to "[h]armonize[ ]" it with these federal efforts. Appellees' Br. 38. But to do that, we would have to rewrite the statute. These laws say nothing about safe-injection sites, and §856(a)(2)'s plain text forbids them. If that ban undermines Congress's current efforts to fight opioids, Congress must fix it; we cannot.

## III. APPLYING §856(a)(2) TO SAFEHOUSE IS A VALID EXERCISE OF CONGRESS'S POWER OVER INTERSTATE COMMERCE

Having held that Safehouse's safe-injection site would violate §856(a)(2), we turn to its affirmative defense under the Commerce Clause. Safehouse argues that Congress lacks the power to criminalize its local, noncommercial behavior. After all, it will not charge visitors to use the consumption room. But the Supreme Court foreclosed that argument in *Gonzales v. Raich*, rejecting a Commerce Clause challenge to a different section of the Controlled Substances Act. 545 U.S. 1, 9 (2005). *Raich* clarifies that Congress can regulate local, noncommercial activity when that activity will affect a national market. Even though Safehouse's consumption room will be local and free, the Act bans it as part of shutting down the national market for drugs. The Commerce Clause, together with the Necessary and Proper Clause, gives Congress the power to do that. U.S. Const. art. I, §8, cl. 3, 18.

31

**A. Congress can regulate local activities either (1) if they are economic and, taken together, substantially affect interstate commerce, or (2) as part of a comprehensive regulatory scheme**

Using its commerce power, Congress can regulate the "channels of interstate commerce"; "instrumentalities," people, and "things in interstate commerce"; and "activities that substantially affect interstate commerce." *United States v. Lopez*, 514 U.S. 549, 558–59 (1995). That last category can cover local activity and thus risks blurring the line "between what is truly national and what is truly local." *Id.* at 567–68. To hold that line, we demand that the local activity Congress regulates be either (1) economic or else (2) covered by a broader scheme to regulate commerce. *See id.* at 559–61. Either route suffices.

1. *Congress can regulate local economic activities that substantially affect interstate commerce*. Federal law may regulate local activities if they are economic and, as a "class of activities," they substantially affect interstate commerce. *Raich*, 545 U.S. at 17 (quoting *Perez v. United States*, 402 U.S. 146, 151 (1971)); *Lopez*, 514 U.S. at 559–60. A court does not decide for itself that a class of activity has substantial economic effects. We ask only whether Congress had a rational basis to think so. *Raich*, 545 U.S. at 22.

Activities can count as economic even if they are not commercial. *Raich*, 545 U.S. at 18. That is because, even without buying or selling, some local activities can collectively affect national supply and demand. Thus, in *Wickard v. Filburn*, the

32

Supreme Court upheld a law capping how much wheat a farmer could grow to feed his own livestock, bake his own bread, and plant his next year's crop. 317 U.S. 111, 114, 127–28 (1942). In the aggregate, it reasoned, excess homegrown wheat could lower demand, compete with wheat on the market, and so substantially affect interstate commerce. *Id.*

2. *Congress can regulate noneconomic activities only as part of a larger regulatory scheme.* Congress's power to regulate noneconomic activities, like many traditionally local crimes, is more limited. "Congress may [not] regulate noneconomic, violent criminal conduct based solely on that conduct's aggregate effect on interstate commerce." *United States v. Morrison*, 529 U.S. 598, 617 (2000). For instance, Congress cannot ban possessing guns near schools just because violent crime might raise insurance rates, hinder education, and thus dampen economic production. *Lopez*, 514 U.S. at 563–64. Nor can it ban violence against women based on how it might harm employment and the economy. *Morrison*, 529 U.S. at 614–15. That is the job of state and local legislatures, not Congress.

But Congress *can* regulate traditionally local, noneconomic activities as part of a larger regulatory scheme. The laws in *Lopez* and *Morrison* were single-subject statutes, not part of regulating interstate markets. By contrast, Congress *can* reach local, noneconomic activities (like simple possession) as "part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated." *Lopez*, 514 U.S. at 561. For example, when this Court faced a federal ban on possessing certain machine guns, we upheld it. *United States v. Rybar*, 103 F.3d 273, 274

(3d Cir. 1996). That law, unlike the one in *Lopez*, sought to halt interstate gun trafficking. *Id.* at 282–83. To shut down the interstate market in machine guns, it had to reach intrastate possession too. *Id.* By the same token, Congress can ban even intrastate possession of child pornography. *United States v. Rodia*, 194 F.3d 465, 479 (3d Cir. 1999).

When Congress regulates local noneconomic activities as part of a scheme, it need only choose means that are " 'reasonably adapted' to the attainment of a legitimate end under the commerce power." *Raich*, 545 U.S. at 37 (Scalia, J., concurring) (quoting *United States v. Darby*, 312 U.S. 100, 121 (1941)).

Having discussed the two bases for regulating local activities, we can now apply them. As the next two sections explain, both the comprehensive-scheme and aggregate-economic-effect rationales independently justify § 856's ban.

## B. Congress can ban local drug-involved premises as part of a comprehensive regulatory scheme

Whether providing drug-involved premises counts as economic activity or not, Congress can regulate it. The drug market is national and international. Congress has found that this trade poses a national threat. Thus, it passed the Controlled Substances Act, a scheme to suppress or tightly control this market. The Act properly seeks to shut down the market for Schedule I and unprescribed Schedule II–V drugs. Because Congress passed a valid scheme to regulate the interstate drug trade, § 856 is constitutional as long as it is "reasonably adapted" to that scheme. *Raich*, 545 U.S. at 37 (Scalia, J.,

34

concurring) (quoting *Darby*, 312 U.S. at 121). And it is. To bolster the Act's scheme, Congress can reach local premises where drug activities happen.

1. *The Controlled Substances Act is a scheme to tightly control the interstate drug market*. Drugs are big business. In 2016 alone, Americans spent $146 billion on cannabis, cocaine, heroin, and methamphetamine. Gregory Midgette et al., RAND Corp., *What America's Users Spend on Illegal Drugs, 2006–2016*, at xiv tbl. S.2 (2019). Congress has recognized that much of this traffic flows in interstate and international commerce. 21 U.S.C. § 801(3). It addressed that market in the Act.

To control drug manufacture, sale, and possession, the Act creates a "closed regulatory system." *Raich*, 545 U.S. at 13. Because Schedule I drugs have no accepted medical use, the Act bans them entirely. *See* 21 U.S.C. § 812(b)(1). For other drugs that have some accepted uses but a "potential for abuse" (those in schedules II–V), the Act requires a prescription. §§ 812(b)(2)(A), (3)(A), (4)(A), (5)(A), 844(a). This scheme seeks to shut down the markets in Schedule I and unprescribed Schedule II–V drugs. *See Raich*, 545 U.S. at 19, 24. That goal is valid, as the power to regulate a market includes the power to ban it. *Id.* at 19 n.29.

2. *Congress can serve this goal by reaching intrastate activities*. The national drug market is bound up with local activities. Drugs produced locally are often sold elsewhere; drugs sold or possessed locally have usually been imported from elsewhere. § 801(3). Even local possession and sale "contribute to swelling the interstate market." § 801(4). So to control the interstate market, the Act reaches intrastate activities.

*Raich* confirms that Congress can do that. *Raich* upheld the Act's ban on local production and possession of marijuana for personal medical use. 545 U.S. at 9. Unlike the laws in *Lopez* and *Morrison*, this ban was part of a comprehensive regulatory scheme to shut down the interstate market in marijuana. *Id.* at 19, 23–24. Drugs are fungible. *Id.* at 18. Local drugs are hard to distinguish from imported ones and can be diverted into the interstate market. *Id.* at 22. Congress rationally believed that failing to regulate intrastate drugs "would leave a gaping hole in the [Act]." *Id.* So it was necessary and proper to enact a flat ban, with no intrastate exception. *Id.; id.* at 34 (Scalia, J., concurring).

3. *Section 856 is a key part of the Act's comprehensive regulatory scheme*. At oral argument, Safehouse sought to distinguish consuming drugs from providing a place to consume them. But just as Congress regulates the drug activities, it can also regulate places where those activities are likely to flourish. Congress added §856 to plug a "gaping hole" in the Act that made it harder to stop drug use and dealing at crack houses and the like. *Raich*, 545 U.S. at 22.

Section 856 is reasonably adapted to control drug manufacture, sale, and possession. Consider state laws that forbid BYOB restaurants to let minors drink alcohol on-site. *See, e.g.*, N.J. Rev. Stat. §2C:33-27(a)(3). Of course, minors themselves may not drink in public. *Id.* §2C:33-15(a). And the restaurants would not be providing the alcohol, only the space and glasses. Yet states still punish them if the minors drink there. Why? Because the ban makes it harder for minors to drink. If restaurateurs know that they could face steep fines for tolerating

underage drinking, they will prevent it from happening. So too here. Just as local drug possession "swell[s] the interstate [drug] traffic," clamping down on local drug use helps restrict that market. 21 U.S.C. § 801(3), (4).

We could stop here. Because § 856 is part of the Act's comprehensive regulatory scheme, Congress has the power to ban even local, noneconomic activity that would undercut that scheme. But another ground independently supports the Act: it regulates economic activity that could, in the aggregate, substantially affect interstate commerce.

### C. Congress had a rational basis to believe that making properties available for drug use will have substantial economic effects

Even if § 856 were not part of a comprehensive regulatory scheme, Congress could still regulate the activities it covers. Safehouse argues that making a local safe-injection site available for free is noneconomic. But *Raich* forecloses that argument.

1. *Making properties available for drug use is economic activity*. *Raich* defined "economics" broadly as "the production, distribution, *and consumption* of commodities." 545 U.S. at 25–26 (quoting *Webster's Third New International Dictionary* 720 (1966)) (emphasis added). These are all activities that affect national supply and demand and thus interstate commerce. So producing, distributing, and consuming drugs are "quintessentially economic" activities. *Id.* Even intrastate growing of marijuana for home consumption is economic,

37

because it could substantially affect the national marijuana market. *Id.* at 19, 25–26.

To be sure, Safehouse will not itself consume drugs. But it will create a "consumption room," a dedicated space for streams of visitors to use drugs. "[T]here is an established, and lucrative, interstate market" for those drugs. *Id.* at 26. Opening a space for consuming drugs will encourage users to come do so. Making consumption easier and safer will lower its risk and so could increase consumption. More drug consumption would create more market demand. Just as "home consumption [of] a fungible commodity" is economic activity that can substantially affect the national market, so too is hosting consumption. *See Raich*, 545 U.S. at 7.

It makes no difference that Safehouse will let its visitors come for free. Wickard grew wheat to feed his own livestock and bake his own bread. 317 U.S. at 114. And though one of the drug users in *Raich* grew her own marijuana and another was given it as a gift, that did not matter. 545 U.S. at 7. Economic activity is broader than commercial activity; it need not involve buying and selling. Congress validly banned these non-commercial uses to control supply and demand in the drug market. *Raich*, 545 U.S. 22–23; *Wickard*, 317 U.S. at 127–28. That was necessary and proper. Congress had the power to regulate the whole class of drug activities, and courts cannot "excise" individual cases from that class just because they are "trivial." *Raich*, 545 U.S. at 23 (quoting *Perez v. United States*, 402 U.S. 146, 154 (1971)).

2. *Congress has a rational basis to believe that this activity, as a class, substantially affects interstate commerce*. Congress could find that maintaining drug-involved premises, as a class, substantially affects commerce. Drug dealers may well congregate near Safehouse, increasing the drug trade and arguably drug demand. True, Safehouse argues that its site will not increase drug demand, as visitors must buy their drugs before arriving. And amici dispute whether safe-injection sites increase drug use and trafficking. That empirical and policy debate is for Congress, not courts. It is enough that Congress could rationally find a causal link between drug-involved premises as a class and commerce. *Raich*, 545 U.S. at 22.

Congressional findings confirm common sense. 21 U.S.C. §801(3)–(6). Drugs typically flow through interstate markets before someone possesses them. §801(3)(C). And intrastate possession helps swell the interstate market. §801(4). So regulating intrastate activity is necessary and proper to clamp down on the interstate market. To be sure, these findings in the Act predate §856, and they do not specifically discuss drug-involved premises. But we may consider findings from prior legislation. *Rodia*, 194 F.3d at 474 n.4; *Rybar*, 103 F.3d at 281. And "Congress [need not] make particularized findings in order to legislate." *Raich*, 545 U.S. at 21.

In short, Congress can regulate Safehouse both to complete the Act's comprehensive regulatory scheme and to stop economic activity that, in the aggregate, could substantially affect interstate commerce.

\* \* \* \* \*

The opioid crisis is a grave problem that calls for creative solutions. Safehouse wants to experiment with one. Its goal, saving lives, is laudable. But it is not our job to opine on whether its experiment is wise. The statute forbids opening and maintaining any place for visitors to come use drugs. Its words are not limited to crack houses. Congress has chosen one rational approach to reducing drug use and trafficking: a flat ban. We cannot rewrite the statute. Only Congress can. So we will reverse and remand for the District Court to consider the RFRA counterclaim.

_____

ROTH, <u>Circuit Judge</u>, dissenting in part and dissenting in judgment.

The Majority's decision is *sui generis*: It concludes that 8 U.S.C. § 856(a)(2)—unlike § 856(a)(1) or any other federal criminal statute—criminalizes otherwise innocent conduct, based solely on the "purpose" of a third party who is neither named nor described in the statute. The text of section 856(a)(2) cannot support this novel construction. Moreover, even if Safehouse's "purpose" were the relevant standard, Safehouse does not have the requisite purpose. For these reasons, I respectfully dissent.[1]

**I**

Despite the ongoing public-health crisis caused by the COVID-19 pandemic, we cannot forget that the United States is also in the middle of an opioid epidemic. "Safehouse intends to prevent as many [opioid-related] deaths as possible through a medical and public health approach to overdose prevention."[2] Safehouse is prepared to provide a wide range of services desperately needed in Philadelphia and routinely provided at Safehouse's companion facility, Prevention Point Philadelphia, including:
    clean    syringe    exchange    services,    primary

_____

[1] I concur with the Majority's rejection of Safehouse's argument that Congress cannot regulate its conduct under the Commerce Clause.
[2] Appx. 116.

1

medical care, an HIV clinic, a Hepatitis C clinic, wound care and education on safer injection techniques, overdose prevention education, overdose reversal kits and distribution, housing, meals, mail services, Medication-Assisted Treatment, and drug recovery and treatment services.[3]

The government takes no issue with any of these services. Instead, it argues that Safehouse should not be permitted to open its doors because of one additional service that it will provide: A Consumption Room. Specifically, Safehouse will provide "medically supervised consumption and observation" so that "[t]hose who are at high risk of overdose death would stay within immediate reach of urgent, lifesaving medical care."[4] "Medical supervision at the time of consumption ensures that opioid receptor antagonists such as Naloxone, and other respiratory and supportive treatments like oxygen, will be immediately available to the drug user in the event of an overdose."[5] Significantly, no one is required to use the Consumption Room to be eligible for *any* of Safehouse's other services,[6] nor will Safehouse provide, store, handle, or encourage the use of drugs, or allow others to distribute drugs on its property.

---

[3] *Id.* at 683.

[4] *Id.* at 116.

[5] *Id.*

[6] *The Safehouse Model*, SAFEHOUSEPHILLY.COM, https://www.safehousephilly.org/about/ the-safehouse-model (last accessed Nov. 17, 2020) ("Upon arrival, participants may choose to go directly to the observation room to access MAT and other services.").

In other words, Safehouse is a drug treatment facility that also seeks to provide much needed overdose care to drug users. If these users are denied access to a Consumption Room, they will still use drugs -- and possibly die on the street. Philadelphia's police and mobile emergency services (EMS) already attempt to provide rescue services for users who pass out on the streets. Often, the Police and EMS cannot do so in a timely manner. Instead of patrolling the streets for users who have overdosed, Safehouse wants to save lives *indoors*.

At oral argument, the government conceded that Safehouse could provide the exact same services it plans to provide in the Consumption Room if it did not do so *indoors*—if, for instance, it provided a Consumption Room inside a mobile van. Yet, according to the Majority's interpretation of section 856(a)(2), Safehouse would be committing a federal crime, punishable by twenty years' imprisonment, if the Consumption Room services were provided inside a building, rather than in a mobile van, parked in front. I cannot interpret section 856(a)(2) to reach such a result.

## II

At oral argument, the government conceded that section 856(a) is poorly written. Indeed, it is nearly incomprehensible. Rather than construe this ambiguous statute narrowly, however, the Majority opts for broad criminal liability, arguing that an organization violates the statute if it makes its property available to a third party, knowing that *the third party* has "the purpose of unlawfully manufacturing, storing, distributing, or *using* a controlled substance."[7] I disagree with such a

---

[7] 18 U.S.C. § 856(a)(2) (emphasis added).

3

construction of the statute. I know of no statute, other that section 856(a)(2), in which the "purpose" of an unnamed third party would be the factor that determines the mens rea necessary for a defendant to violate the statute. This problematic construction is particularly evident here because the parties agree that the "purpose" in section 856(a)(1) refers to the defendant's "purpose."

**A**

This divergence of interpretation violates the rules of statutory construction: "identical words used in different parts of the same statute are generally presumed to have the same meaning."[8] The Majority offers no reason to disregard this presumption. And to the extent that there is any ambiguity, the legislative history goes against the Majority. This precise issue was addressed in the floor debates of the 2003 amendments to section 856(a): Then-Senator Joseph Biden stated that "rogue promoters" charged under the statute must "not only know that there is drug activity at their event but also *hold the event for the purpose of illegal drug use or distribution*. . . . Let me be clear. Neither current law nor my bill seeks to punish a promoter for the behavior of their patrons."[9]

The Majority also construes section (a)(2)'s *mens rea* requirement unlike any other federal criminal statute. Indeed, the Majority has not identified a single statute that criminalizes otherwise innocent conduct—here, lawfully making your property "available for use"—solely because of the subjective thoughts of a third party not mentioned in the statute.

---

[8] *IBP, Inc. v. Alvarez*, 546 U.S. 21, 34 (2005).
[9] 149 Cong. Rec. S1678 (emphasis added).

4

At oral argument, the government suggested that conspiracy requires proof of third-party intent. True, but conspiracy statutes use the word "conspire," which refers to a third party and that party's purpose. For centuries, "conspiracy" has had a well-accepted common law meaning that we still use today: an "agreement," "combination," or "confederacy" of multiple people.[10] "When Congress uses a common law term . . . we generally presume that it intended to adopt the term's widely-accepted common law meaning . . . ."[11] Moreover, conspiracy is a specific-intent crime[12] that requires a defendant to share and agree to facilitate a co-conspirator's illicit purpose.[13] By contrast, the Majority's construction of

---

[10] *United States v. Hinman*, 26 F. Cas. 324, 325 (C.C.D.N.J. 1831) (No. 15,370); *accord United States v. Burr*, 25 F. Cas. 187, 193 (C.C.D. Va. 1807) (No. 14,694) ("[A defendant] cannot conspire alone."); 4 WILLIAM BLACKSTONE, COMMENTARIES 136 n.19 ("To constitute a conspiracy . . . there must be at least two persons implicated in it."); *see also State v. Buchanan*, 5 H. & J. 317, 334 (Md. 1821) ("[I]f combinations for any of the purposes mentioned in the statute, were punishable at all, it could only have been on the ground, that both the offence of conspiracy (*eo nomine*), and the punishment, were known to the law anterior to the enactment of the statute . . . .").

[11] *United States v. Hsu*, 155 F.3d 189, 200 (3d Cir. 1998); *accord Salinas v. United States*, 522 U.S. 52, 63 (1997).

[12] *Ocasio v. United States*, 136 S. Ct. 1423, 1429 (2016); *United States v. Applewhaite*, 195 F.3d 679, 684 (3d Cir. 1999); *accord United States v. Williams*, 974 F.3d 320, 369–70 (3d Cir. 2020) ("[T]he defendant [must] join[] the agreement knowing of its objectives and with the intention of furthering or facilitating them.").

[13] *See United States v. Tyson*, 653 F.3d 192, 209 (3d Cir. 2011) ("[T]he pertinent inquiry is whether Tyson and Morrell agreed to

5

section 856(a)(2) does not require a defendant to have any particular purpose whatsoever; it is the third party's purpose that is unlawful. And, unlike in a conspiracy, the government specifically argues that intent to facilitate is not necessary.

Nor is the Majority's construction of section 856(a)(2) similar to *Pinkerton* liability.[14] *Pinkerton* allows for liability based on a coconspirator's *completed acts*,[15] not her thoughts. Moreover, those acts must be a foreseeable part or consequence of a conspiracy that the defendant intentionally entered.[16] Finally, the penalties for conspiracy and *Pinkerton* liability are usually limited to those available for the underlying crimes.[17] By contrast, a section 856(a)(2)

---

achieve the conspiracy's ends."); *United States v. Coleman*, 811 F.3d 804, 808 (3d Cir. 1987).

[14] *See* Nov. 16, 2020 Tr. at 65:23–66:2.

[15] *See United States v. Ramos*, 147 F.3d 281, 286 (3d Cir. 1998); *see also Bahlul v. United States*, 840 F.3d 757, 792 (D.C. Cir. 2016) (Millett, J., concurring in *per curium* opinion) ("Pinkerton liability . . . relies on the imputation of co-conspirators' completed offenses.").

[16] *See United States v. Casiano*, 113 F.3d 420, 427 (3d Cir. 1997).

[17] *See, e.g.*, 21 U.S.C. § 846 ("Any person who attempts or conspires to commit any offense defined in this subchapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy."); *United States v. Brooks*, 524 F.3d 549, 557 (4th Cir. 2008). *But see* 18 U.S.C. § 371 (providing for five-year maximum for conspiracies against the United States, which may be committed without an underlying criminal object); *see also United States v. Conley*, 92 F.3d 157, 163–65 (3d Cir. 1996).

defendant may receive up to twenty years' imprisonment, while the third party could be exposed to as little as one year.[18]

**B**

The Majority's construction wreaks havoc with the rest of the statute. The Majority relies on out-of-circuit decisions, beginning with *United States v. Chen*,[19] holding that "under § 856(a)(2), the person who manages or controls the building and then rents to others, need not have the express purpose in doing so that drug related activity take place; rather such activity is engaged in by others (*i.e.*, others have the purpose)."[20] *Chen* and its progeny did not explain their leap from the (likely correct) conclusion that the illicit "activity is engaged in by others" to their (incorrect) conclusion that the defendant need not have an illicit purpose.

Instead, *Chen* and its progeny stated only that a contrary interpretation would render either section (a)(1) or (2) "superfluous." Unsurprisingly, *Chen* and its progeny did not explain that conclusion. In fact, they contradict each other as to which subsection would be rendered superfluous: The *Chen* court stated that *section (a)(2)* would be superfluous, whereas

---

[18] *See* 21 U.S.C. § 844(a) ("Any person who [possesses a controlled substance] may be sentenced to a term of imprisonment of not more than 1 year, and shall be fined a minimum of $1,000, or both . . . .").
[19] 913 F.2d 183 (5th Cir. 1990).
[20] *Chen*, 913 F.2d at 190 (citing *United States v. Burnside*, 855 F.2d 863 (Table) (9th Cir. 1988)); *accord United States v. Tebeau*, 713 F.3d 955 (8th Cir. 2013); *United States v. Wilson*, 503 F.3d 195, 197–98 (2d Cir. 2007); *United States v. Banks*, 987 F.2d 463, 466 (7th Cir. 1993); *United States v. Tamez*, 941 F.2d 770, 773–74 (9th Cir. 1991).

7

other courts of appeals have stated that *both* sections would "entirely overlap" and "have no separate meaning."[21]

In any event, the text of the statute demonstrates that all these courts of appeals are wrong. When *Chen* was decided, the *only* overlap between the two sections was the phrase "for the purpose of."[22] In other words, *Chen* and its progeny decided that, to avoid superfluity, the *only* words that were the *same* between the two sections must have *different* meanings. There is no rule of construction that supports or even permits such a reading.

Rather, the distinction between sections (a)(1) and (2) is in their respective *actus reus* requirements. Section (a)(1) has one *actus reus* element; section (a)(2) has two. Before 2003, those elements did not overlap at all; the 2003 amendments created only minor overlap by adding "rent" and "lease" to section (a)(1). I do not see why we should twist the text of the statute based on the potential overlap of two words,[23] let alone why *Chen* did so before *any* overlap existed.

In sum, the Majority construes sections 856(a)(1) and (2)'s identical "purpose" elements differently but holds that their different *actus reus* elements are identical. That need not be the case. For example, section (a)(1) would be violated where a property owner sells drugs from his home but does not let others use it; section (a)(2) would not. Section (a)(2) would

---

[21] *Tamez*, 941 F.2d at 774; *accord Tebeau*, 713 F.3d at 960.

[22] Even the listed purposes are not identical: Unlike § (a)(1), § (a)(2) includes "storing" controlled substances.

[23] *Loughrin v. United States*, 573 U.S. 351, 358 n.4 (2014) (explaining that even "substantial" overlap between sections of a criminal statute "is not uncommon").

8

be violated where a rave operator encourages drug dealers to attend events to increase attendance; section (a)(1) would not. Because Safehouse's construction better comports with the statute's text and does not render either section completely superfluous, I would adopt it.

## C

The Majority's construction also violates the "deeply rooted rule of statutory construction" that we must avoid "unintended or absurd results."[24]

### i

As Safehouse correctly argues, under the Majority's construction, parents could violate the statute by allowing their drug-addicted adult son to live and do drugs in their home even if their only purpose in doing so was to rescue him from an overdose. Conceding that its reading of section (a)(2) cannot be taken literally, the Majority concludes that a defendant cannot be guilty where drug use is merely "incidental" to the guest's other purposes. Thus, the hypothetical parents would not violate the statute because their son's drug use was incidental to his use of the home as a residence. By trying to assure us that the hypothetical parents would not violate the statute, the Majority implicitly acknowledges that such a result would be impermissibly absurd. Although I agree that

---

[24] *United States v. Hodge*, 321 F.3d 429, 434 (3d Cir. 2003) (Ambro, J.); *accord United States v. Bankoff*, 613 F.3d 358, 369 n.10 (3d Cir. 2010) (Ambro, J.) (explaining that assuming Congress was unaware of the terms used in one statute when enacting another statute "would lead to an absurd result").

incidental purposes do not trigger the statute, absurd results are unavoidable under the Majority's construction.

The Majority relies on the consensus of other courts of appeals that a defendant's "casual" drug use in his home does not violate the original version of section 856(a)(1) because the drug use was incidental to the purpose for which he maintained the property, *i.e.*, as a residence.[25] Neither the Majority nor the cases it cites define "incidental." Fortunately, we have. In *United States v. Hayward*,[26] we adopted an incidental-purpose test for 18 U.S.C. § 2423(b), which made it unlawful to "travel in foreign commerce for the purpose of engaging in sex with a minor." We held that illicit sexual activity must be "a *significant or motivating* purpose of the travel across state or foreign boundaries," rather than merely "incidental" to the travel.[27] Even assuming that other courts of appeals' gloss on "maintain" in section (a)(1) survived the 2003 amendment[28] and comports with *Hayward*, it does not neatly apply to a

---

[25] *E.g.*, *United States v. Lancaster*, 968 F.2d 1250, 1253 (D.C. Cir. 1992).

[26] 359 F.3d 631 (3d Cir. 2004) (Garth & Ambro, J.).

[27] *Hayward*, 359 F.3d at 638 (emphasis added); *accord United States v. Vang*, 128 F.3d 1065, 1071 (7th Cir. 1997). Although "for the purpose of" in § 2434(b) was later amended explicitly to "with a motivating purpose," the legislative history does not indicate that Congress intended to increase the government's burden of proof.

[28] That amendment added "use" to § 856(a)(1). Other circuits have continued to assume—correctly, I think—that using drugs in one's own home still does not violate § (a)(1). *See United States v. Shetler*, 665 F.3d 1150, 1164 n.8 (9th Cir. 2011) ("The amendments increase the possibility that § 856(a)(1) would be unconstitutionally vague if construed expansively. What is meant by 'use' of 'any place ... temporarily' is, for example, certainly far from clear.").

10

guest's purpose in "us[ing]" property under section (a)(2) or avoid the absurd results inherent in the Majority's construction.

The Majority assumes that the son's purpose in moving in with his parents was to use the home as a residence. Not necessarily. Although the parents likely "maintain" their home for the purpose of living in it, their son may be motivated by many purposes to "use" it. If the son could not do drugs there, would he still move in? Alternatively, the son might already have a home (or be indifferent to being homeless) but begrudgingly accepted his parents' invitation to move in with them because he shared their concern about overdosing. Like Safehouse's participants, the son would 'use" the home because he was motivated by an "unlawful" purpose (supervised drug use) that was not incidental to his residency in the home, and the parents knew it. Under the Majority's construction, the parents were operating a crack house. That cannot be what the statute intends to say. Or suppose the son intended to do drugs there once, steal his mother's jewelry, and run away. If the parents were reasonably sure that he would run away but gave him a chance anyway, have they violated the statute under *Chen*'s deliberate-ignorance standard? The Majority's construction suggests so, particularly if this was the son's second or third chance. And under the Majority's construction, the parents would certainly violate section (a)(2) if they invited their son to do drugs in their home under supervision but not live there; this result is far afield from the crack houses and raves targeted by the statute.

Even apart from the hypothetical parents, absurd results abound under the Majority's construction. For example, the Majority would criminalize a vacationing homeowner who pays a house sitter but also allows the sitter to smoke marijuana

11

in his home. If the homeowner knew that the sitter cared less about the pay than about having a place to smoke marijuana, *housesitting* is the incidental use. At oral argument, the government contended that drug use in these circumstances would still be an "incidental" purpose because violating the statute somehow depended on the number of people that the defendant allowed to use the property. The statute does not mention a numeric threshold. The Majority does not explain why a guest's purpose depends on the number of persons sharing that purpose, and any threshold would necessarily involve arbitrary line-drawing.

The Majority would also criminalize homeless shelters where the operators know their clients will use drugs on the property. Although the government argues that the shelter, like the parents, would be protected by the incidental-purpose test, it again just *assumes* that "the people who stay [at the shelter] have housing as their primary purpose."[29] Again, not necessarily. An operator of a homeless shelter may know (or be deliberately ignorant of the fact) that some clients will stay at the shelter because they want a concealed place to use drugs and to sleep off the high. In other words, if they were prevented from using drugs there, some of them might not go there at all.

Throughout these proceedings the government has followed the statute's text only selectively. As yet another example, the government insists that "place" includes only "real property."[30] Thus, the government concedes that Safehouse could provide a Consumption Room in a mobile van

---

[29] Gov't's Reply at 15.
[30] Nov. 16, 2020 Tr. at 34:4–35:7.

12

parked outside its facility. Although that hypothetical does not directly implicate the "purpose" element, the government's response when pressed on this hypothetical at oral argument is significant: The government conceded that it "ha[sn't] thought . . . enough" about the potential consequences of its construction of the statute.[31] As shown above, the government's lack of thought is self-evident. In fact, the government's construction of the statute, adopted by the Majority here, is intolerably sweeping. No amount of a textual gloss will save it.

**ii**

The Majority's construction also conflicts with other federal policies. For example, HUD strongly discourages landlords from evicting certain classes of tenants for drug use alone.[32] The government again invokes the incidental-purpose test, arguing that HUD's "guidance regarding drug use . . . aims to connect homeless individuals to housing 'without preconditions and barriers to entry.'"[33] Under the Majority's construction, however, *HUD's* purpose is irrelevant. Nor is the landlord protected because this is a "residential example[]"[34]: Even if the landlord knows that a tenant uses the property *primarily* for drug binges, HUD expects the landlord to continue leasing the property to the tenant unless the tenant otherwise violates the lease.

---

[31] *Id.* at 37:7–21.

[32] HUD, HOUSING FIRST IN PERMANENT SUPPORTIVE HOUSING at 3 (July 2014), *available at* https://files.hudexchange.info/resources/documents/Housing-First-Permanent-Supportive-Housing-Brief.pdf.

[33] Gov't's Reply at 15 n.5.

[34] *Id.*

13

The Majority's construction is also inconsistent with congressional grants for sanitary syringe programs. In some instances, this funding can be used to purchase syringes for the injection of controlled substances,[35] and the CDC strongly encourages these programs to "[p]rovi[de] . . . naloxone to reverse opioid overdoses."[36] Naloxone is indicated to reverse "opioid depression, including respiratory depression."[37] By explicitly acknowledging that these programs will provide syringes for controlled substances and encouraging them to provide medication used to treat ongoing overdoses, Congress clearly envisioned that drug use would likely occur on or immediately adjacent to the programs' properties. In other words, Congress is knowingly funding conduct that, according to the Majority, is a crime punishable by twenty years' imprisonment.

The Majority does not dispute that this would be anomalous. Instead, the government argues that "Congress's failure to speak directly to a specific case that falls within a more general statutory rule" does not "create[] a tacit exception."[38] But that begs the question. Safehouse argues

---

[35] *See, e.g.*, Consolidated Appropriations Act of 2016, Pub. L. No. 114-113, 129 Stat. 2242, § 520.

[36] CDC, PROGRAM GUIDANCE FOR IMPLEMENTING CERTAIN COMPONENTS OF SYRINGE SERVICES PROGRAMS, 2016 at 2 (2016), *available at* https://www.cdc.gov/hiv/pdf/risk/cdc-hiv-syringe-exchange-services.pdf.

[37] FDA, PRODUCT INSERT, NALOXONE HYDROCHLORIDE INJECTION SOLUTION (Sept. 9, 2020), *available at* https://www.accessdata.fda.gov/spl/data/5ac302c7-4e5c-4a38-93ea-4fab202b84ee/5ac302c7-4e5c-4a38-93ea-4fab202b84ee.xml.

[38] Gov't's Reply at 23 (quoting *Bostock v. Clayton Cty.*, 140 S. Ct. 1731, 1746 (2020)).

14

that it does not fall under the "general statutory rule" because the statute requires *it* to act with a particular "purpose" that it does not have; it does not seek to create an "exception." Although not dispositive, Congress's appropriation decisions provide further evidence that Safehouse's construction is correct.

### iii

Safehouse's construction avoids these absurd results. Illicit drug activity does not motivate parents to make their home available to an adult son who is addicted to heroin. To the contrary, they want their son's drug use to stop. Nor does illicit drug activity motivate shelter operators to admit homeless people; or vacationing homeowners to look the other way when their house sitters use drugs; or landlords to continue leasing property to HUD recipients. In each instance, the owners act *despite* their knowledge that drug use will occur, not *for the purpose* that drug use occur.

By contrast, and contrary to the government's assertions, illicit drug activity does motivate drug dealers to operate crack houses. They may have an overarching motive of making money, but they specifically desire to achieve that end through drug sales. They want the drug sales to occur. Making the property available to customers to buy and use drugs also facilitates the dealer's unlawful purpose by helping to avoid police. Similarly, drug sales and use are part of rave operators' business models because they drive up attendance. Thus, in *United States v. Tebeau*,[39] there was ample circumstantial evidence that the campground owner wanted

---

[39] 713 F.3d 955 (8th Cir. 2013).

attendees to use drugs. Drug use and sales at his music festivals were so widespread that they presumably influenced attendance, for which the owner charged a $50 admission fee. Indeed, the owner explicitly instructed security to admit dealers of marijuana and psychedelics, who openly advertised their products.

****

In sum, despite complaining that Safehouse's construction is somehow inconsistent with the statute's ambiguous text, the Majority has not identified a single inconsistency. Instead, the Majority relies on textual gloss after textual gloss, read into the statute by other courts of appeals over the last thirty years. The result is like a George Orwell novel where identical words have different meanings, different words are superfluous, and two plus two equals five. Furthermore, the Majority would require a defendant to divine whether a third party's illicit purpose is "primary," "substantial," "incidental," or whatever other adjective fits the government's argument at a given moment. Far from having a "well-established limiting principle,"[40] the Majority does not define these terms, and courts have had substantial difficulty pinning them down.

I would construe section (a)(2)'s purpose element consonant with the identical language in section (a)(1) and not contrary to virtually every other criminal statute on the books. If the government wishes to prosecute Safehouse, it must show that Safehouse will act with the requisite purpose. As explained below, the government has not done so.

---

[40] Gov't's Reply at 13.

16

## III

I agree with the Majority that a defendant can have multiple purposes and still be criminally liable.[41]  I also agree that a defendant's intentional, unlawful acts usually are not excused merely because they are a step to achieving some benevolent goal.  Thus, in *United States v. Romano*,[42] we held that a lawful motive was not a defense to a crime requiring the defendant to act with "*an*" or "*any*" "unlawful purpose."[43]  Where, as here, a statute uses the phrase "for *the* purpose of,"[44] however, our precedents focus on the defendant's motivations.[45]  Accordingly, I would hold that a defendant, who is not motivated at least in part by a desire for unlawful drug activity to occur and who in fact wants to reduce drug activity, has not acted with the requisite purpose under section 856(a).  On this record, Safehouse has no "unlawful" motivating purposes.

## A

The government concedes that Safehouse's entire facility is the relevant "place."[46]  There is no evidence suggesting that Safehouse will admit anyone to its facility hoping that they will use drugs.  To the contrary, it actively

---

[41] *See Hayward*, 359 F.3d at 638.

[42] 849 F.2d 812 (3d Cir. 1988).

[43] *Romano*, 849 F.2d at 812, 816 n.7 (emphasis added); *accord* 18 U.S.C. § 1382 (making it unlawful to "go[] upon any military . . . installation, for *any* purpose prohibited by law or lawful regulation" (emphasis added)).

[44] *United States v. Shetler*, 665 F.3d 1150, 1162 (9th Cir. 2011).

[45] *See Hayward*, 359 F.3d at 638.

[46] Nov. 16, 2020 Tr. at 7:13–23, 8:12–23.

17

tries to persuade users to stop. Unlike drug dealers and rave operators, Safehouse's motivating purpose is to put itself out of business.

The Majority puts undue emphasis on Safehouse's belief that the Consumption Room will make participants more amenable to drug treatment. The record does not show that that belief is the Consumption Room's *purpose*. To the contrary, increased amenability to drug treatment may be just an incidental *benefit* of making Safehouse's facility "available for use" for the purpose of providing medical care to people who would otherwise do drugs on the street and risk overdose—just as having an indoor place to use drugs is an incidental benefit of "maintaining" a house for the purpose of living there. Significantly, Safehouse does not prefer that participants choose the Consumption Room over direct entry into rehabilitation: Participants can always enter drug treatment at Safehouse,[47] and, for decades, defendant Benitez has tried (and continues to try) to have drug users enter into rehabilitation through PPP.

---

[47] I have again "look[ed] at the factual stipulations," as the government requested, but found nothing suggesting that it "is very unlikely" that "somebody could come into Safehouse and not be there to . . . ingest drugs" or that Safehouse "is not . . . set up [for] people to come in to just get treatment." Nov. 16, 2020 Tr. at 17:10–18:21. To the contrary, "Safehouse intends to encourage every participant to enter drug treatment, which will include an offer to commence treatment *immediately*," Appx. at 684, ¶ 9 (emphasis added), and Safehouse explicitly states on its website that participants can access its other services withing using the Consumption Room.

18

Even if just the Consumption Room, not the full Safehouse premises, were the relevant "place," the government's claim still fails. In effect, the Majority is trying to put yet another gloss on the statute: Section 856(a)(2) requires the defendant to make a place "available for use" for the purpose of "using a controlled substance," not, as the Majority would have it, "using a controlled substance [*in the place*]." Because Safehouse requires participants to bring their own drugs, Safehouse likely believes that participants would use drugs regardless of whether the Consumption Room is available. Safehouse's desire for participants to use drugs in the Consumption Room, *as opposed to the street*, does not imply that Safehouse desires that they use drugs at all.

Moreover, and significantly, the record does not suggest that participants must use drugs to enter to the Consumption Room. For example, they could go to the Consumption Room to receive fentanyl testing or safe-injection education for drugs they intend to ingest elsewhere, or Naloxone to treat an ongoing overdose that began outside the facility. Nor is there any evidence that the Consumption Room will facilitate drug use or that Safehouse believes that it will do so.[48] Making the

---

[48] Although the government is correct that § 856(a)(2) does not include the word "facilitate," it is hard to imagine how an action can be taken "for" a particular "purpose" if it does not facilitate that purpose. Courts routinely use "purpose" and "facilitate" interchangeably. *See, e.g.*, *Abuelhawa v. United States*, 556 U.S. 816, 824 (2009) ("The Government does nothing for its own cause by noting that 21 U.S.C. § 856 makes it a felony to facilitate 'the simple possession of drugs by others by making available for use . . . a place for the purpose of unlawfully using a controlled substance" even though the crime facilitated may be a mere misdemeanor."); *United States v. Durham*, 902 F.3d 1180, 1193 (10th Cir. 2018);

19

Consumption Room available may make drug use safer, but the record does not show that safer drug use is easier than unsafe drug use or causes more drug use to occur.

In conclusion, the government has not met its burden of showing that drug use will be one of Safehouse's motivating purposes. Rather, Safehouse is trying to save people's lives.

**B**

Even if "drug use" were Safehouse's purpose, Safehouse still does not violate the statute. Moreover, to the extent that the Majority holds that Safehouse does, the statute is unconstitutional. "Using a controlled substance" is not "unlawful" under federal law; possessing it is. At oral argument, it was suggested that using drugs is unlawful under state law. Not so. Pennsylvania law criminalizes the use of drug paraphernalia in certain circumstances,[49] but not the use of drugs itself.[50]

---

*United States v. McGauley*, 279 F.3d 62, 76 (1st Cir. 2002); *United States v. Bolden*, 964 F.3d 283, 287 (4th Cir. 2020); *United States v. Petersen*, 622 F.3d 196, 208 (3d Cir. 2010); *United States v. Cole*, 262 F.3d 704, 709 (8th Cir. 2001); *United States v. Ellis*, 935 F.2d 385, 390–91 (1st Cir. 1991); *see also Rewis v. United States*, 401 U.S. 808, 811 (1971); *Fed. Ins. Co. v. Mich. Mut. Liab. Co.*, 277 F.2d 442, 445 (3d Cir. 1960) ("Removing and replacing the rear wheels was to facilitate unloading, not for the purpose of preserving an existing state or condition . . . .").

[49] *See* 35 PA. CONS. STAT. § 780-113(a)(32);

[50] *Commonwealth v. Rivera*, 367 A.2d 719, 721 (Pa. 1976) ("The m[e]re possession of such drugs, however, is not an offense under the law . . . ."). The government argues that using drugs necessarily involves unlawful possession. Section 856(a) requires, however,

Moreover, because "drug use" is not unlawful in some states but is unlawful in others, we are faced with situations where property possessors in different states may be treated differently by section 856(a)(2). In situations where the only "unlawful" purpose of an establishment is "drug use," section 856(a)(2) would allow someone in one state to use his property in ways that someone in another state could not.[51] The Equal Protection Clause has long been applied to the federal government[52] and prohibits discrimination that is not "rationally related to a legitimate governmental interest."[53] I cannot conceive of any rational basis for prosecuting those who manage or control property in a state where "drug use" is

---

that the defendant act for the purpose of "unlawfully . . . using" drugs; it is not enough that they act for the purpose of using drugs coupled with some different unlawful activity such as possession. If Congress meant "possessing," it certainly knew how to say so; instead, it said "using." Although proof of use can serve as proof of unlawful possession, "the terms 'possession' and 'use' are by no means synonymous or interchangeable." *United States v. Blackston*, 940 F.2d 877, 883 (3d Cir. 1991). The same is true of using drug paraphernalia for the purpose of ingesting drugs: The operative unlawful conduct is the use of drug paraphernalia for the purpose of using drugs; § 856(a) requires the drug use itself, however, to be unlawful.

[51] *See Hurtado v. United States*, 410 U.S. 578, 595 (1973) (Brennan, J. concurring in par) ("My conclusion that the majority has misconstrued the statute is fortified by the conviction that the statute, as interpreted by the Court, would be invalid under the Due Process Clause of the Fifth Amendment.").

[52] *See Bolling v. Sharpe*, 347 U.S. 497, 499 (1954).

[53] *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 533 (1973); *cf. Soto-Lopez v. N.Y. City Civ. Serv. Comm'n*, 755 F.2d 266, 275–76 (2d Cir. 1985).

illegal and not doing so in a state where "drug use" has not been made illegal.[54]

## IV

In sum, I cannot agree with the Majority's interpretation of section 856(a)(2). Because Safehouse does not have any of the purposes prohibited by section 856(a)(2), I would affirm the District Court's holding that Safehouse's conduct will not violate the CSA. For the above reasons, I respectfully dissent.

---

[54] That is not to say that Congress can never incorporate state law into a federal criminal statute if it does not discriminate based on the location of property or has a rational basis for doing so. *See, e.g.*, *United States v. Titley*, 770 F.3d 1357, 1360–62 (10th Cir. 2014).