UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 20-1422
_____

UNITED STATES OF AMERICA
v.
SAFEHOUSE, a Pennsylvania nonprofit corporation;
JOSÉ BENITEZ, as President and Treasurer of Safehouse

*******************

SAFEHOUSE, a Pennsylvania nonprofit corporation
v.
U.S. DEPARTMENT OF JUSTICE;
WILLIAM P. BARR, in his official capacity
as Attorney General of the United States; and
WILLIAM M. MCSWAIN, in his official capacity as
U.S. Attorney for the Eastern District of Pennsylvania

United States of America, U.S. Department of Justice,
United States Attorney General William P. Barr, and
the United States Attorney for the Eastern District of
Pennsylvania William M. McSwain,
                                                    Appellants

_____

(E.D. Pa. No. 2:19-cv-00519)
_____

SUR PETITION FOR REHEARING
_____

Present:    SMITH, <u>Chief Judge</u>, and McKEE, AMBRO, CHAGARES,
            HARDIMAN, GREENAWAY, JR., SHWARTZ, RESTREPO,
            BIBAS, MATEY, PHIPPS, and ROTH,[1] <u>Circuit Judges</u>

_____

[1] Judge Roth's vote is limited to panel rehearing only.

1

The petition for rehearing filed by Appellees in the above-captioned case having been submitted to the judges who participated in the decision of this Court and to all the other available circuit judges of the circuit in regular active service, and no judge who concurred in the decision having asked for rehearing, and a majority of the judges of the circuit in regular service not having voted for rehearing, the petition for rehearing by the panel and the Court en banc is **DENIED**. Judges McKee, Restrepo, and Roth would have granted the petition.

By the Court,

s/Stephanos Bibas
Circuit Judge

Dated: March 24, 2021
Lmr/cc: All Counsel of Record

**OPINION SUR DENIAL OF PETITION FOR REHEARING**

McKee *joined by* Restrepo and Roth

Ultimately, the meaning of 21 U.S.C. § 856(a)(2) must be decided by Congress. However, that is no reason for us not to hear this case *en banc*. Until Congress acts, Safehouse and others who attempt the kind of therapeutic response that is at issue here will continue to risk substantial prison sentences.

The District Court was the first in the country to interpret 21 U.S.C. § 856(a)(2) and numerous jurisdictions around the country are considering the same kind of therapeutic intervention that now places Safehouse in prosecutorial crosshairs. Even if the Majority's analysis is correct, this declaratory judgment action is too important to deny *en banc* review by the entire court. The Majority opinion will be studied by other jurisdictions around the country where entities like Safehouse are considering similar therapeutic responses to the life-threatening opioid epidemic that is engulfing so many communities and destroying so many lives.[2]

---

[2] Examples of innovative programs were brought to the Court's attention in amicus briefs submitted on behalf of interested cities and states. As of 2018, 44 states have enacted Good Samaritan legislation offering limited immunity from drug-related charges for by-standers and other drug-users seeking help for those experiencing overdose. *See* Brief of the District of Columbia, and the States of Delaware, Illinois, Michigan, Minnesota, New Mexico, Oregon, Vermont, and Virginia as Amici Curiae in Support of the Petition for Rehearing *En Banc* at 6-9, *United States v. Safehouse*, 985 F.3d 225 (3d Cir. 2021) (No. 20-1422) (hereinafter States' Amicus). *See also* Brief of Fourteen Cities and Counties as Amici Curiae in Support of Appellees' Petition for Rehearing *En Banc* at 4, *United States v. Safehouse*, 985 F.3d 225 (3d Cir. 2021) (No. 20-1422). Additionally, California, New Mexico, and Utah have all introduced bills seeking to open safe injection sites. *See* States' Amicus at 11.

Yet, by denying the Petition for Rehearing that has been filed, we declare that the issue is not sufficiently important for the entire court to consider *en banc*. Hopefully, legislation will clarify the meaning of 21 U.S.C. § 856(a)(2), but until that day comes, we owe it to these parties and to communities within our jurisdiction to adjudicate this matter *en banc*. Moreover, for the reasons so cogently set forth in Judge Roth's dissent, which I will briefly elaborate upon, I believe there are problems with the Majority's analysis. Independent of the sweeping importance of this matter, those problems counsel rehearing. However, whether the Majority or Dissent is correct, few other cases will merit *en banc* review as much as this one. I therefore dissent from the denial of the Petition for Rehearing.

## I.

The Majority proceeds as if this statute is so clear and unambiguous that resort to legislative history and canons of statutory construction is not appropriate; that simply is not so. Four judges have now examined the language of 21 U.S.C. § 856(a)(2). Two interpret it one way and two interpret it another. In a very thorough and well-reasoned opinion, the District Court painstakingly examined the statutory text as well as several doctrines of statutory construction and explained why § 856(a)(2) is ambiguous. In resolving that ambiguity, the District Court explained why the statute cannot reasonably be interpreted as an expression of congressional intent to criminalize what all agree is a therapeutic intervention by Safehouse. Judge Roth's dissent explains why she believes the District Court's interpretation of § 856(a)(2) is correct. The Majority reaches the

4

opposite conclusion based upon its interpretation of that same language. My colleagues in the Majority claim that their conclusion is based solely on the text of the statute devoid of any and all policy considerations. That is not true. They must read words into the statute that simply are not there in order to avoid the very troubling consequences that naturally result from their rigid insistence on a strictly literal interpretation.

Safehouse is an entity whose Board of Directors is comprised of a former Governor of Pennsylvania, an academician, and prominent evangelists and theologians. The Advisory Committee includes the Commissioner of Public Health of the City of Philadelphia, deans of the schools of public health of prominent universities in the city, a managing director of a healthcare group, and an emergency room physician. Given the Majority's interpretation of this statute, each of them could theoretically be prosecuted under 21 U.S.C. § 856(a)(2) and exposed to a period of incarceration of up to 20 years.[3]

Of course, neither status nor professional achievement should ever immunize one from prosecution for criminal conduct. If community leaders, university deans, theologians, and clinicians have actually engaged in conduct that Congress intended to criminalize, their status in the community and their good intentions is relevant, if at all, only to sentencing. As the Majority correctly notes, "[G]ood intentions cannot override the plain text of [a] statute."[4] But the forceful argument of the Dissent and the very well-reasoned District Court opinion illustrate that we are not dealing with "plain text." As

---

[3] *See* 18 U.S.C. § 2 (imposing liability as a principal on anyone who aids, abets, counsels or procures the commission of a federal crime).
[4] *United States v. Safehouse*, 985 F.3d 225, 236 (3d Cir. 2021).

Judge Roth explains, the statute is "nearly incomprehensible," and the Government conceded at argument that it is "poorly written."[5]

All agree that 21 U.S.C. § 856(a)(2) makes it illegal to "manage or control" a property and "knowingly and intentionally" open it to visitors "for the purpose of . . . using a controlled substance." As the Majority explains, "[t]his case turns on how to construe and apply § 856(a)(2)'s last phrase: 'for the purpose of.'"[6] The Majority believes that "[t]o get a conviction under (a)(2), the government must show only that the defendant's *tenant or visitor* had a purpose to . . . use drugs."[7] They conclude that this "follows from the law's language and grammar," and that "[i]t avoids making paragraph (a)(2) redundant of (a)(1)."[8] But, of course, there is a problem. As the Dissent explains, such an interpretation imposes criminal liability on a property owner based upon the conduct of a third party.[9] Judge Roth correctly hypothesizes that this would subject parents to substantial criminal sanctions—including lengthy imprisonment—if they allow their addicted child to live at home and consume drugs there in order to minimize the chances of a fatal overdose.[10]

The Majority nevertheless insists that the language of § 856 controls: as "the statute's plain text covers safe-injection sites[, w]e look no further."[4] By looking "no

---

[5] *Id.* at 244 (Roth, J., dissenting).
[6] *Id.* at 232.
[7] *Id.* at 233 (emphasis in original).
[8] *Id.*
[9] *Id.* at 245 (Roth, J., dissenting).
[10] Other hypotheticals abound, but for the sake of brevity, I focus on this one. For other examples of the reach of the Majority's holding, *see id.* at 238, 247-48.

further," my colleagues put on blinders and thereby avoid the uncomfortable and troubling consequences of their interpretation. If the statute were clear, I would agree. It is well established that a court must "give effect to a statute's unambiguous plain language unless it produces a result demonstrably at odds with the intentions of the drafters … or an outcome so bizarre that Congress could not have intended it."[11] Both considerations are present here. Given the ambiguities of the statute and the logical consequences of our holding, we should be exceedingly reluctant to assume Congress intended this statute to sweep as broadly as the Majority holds.

As a purely textual matter, Judge Roth's hypothetical about parents who allow their addicted son or daughter to return home to "shoot up" certainly does fall squarely within the text of the statue. The Majority concludes that "[t]he plain text requires only that the third party [i.e. the child] have the purpose of drug activity," and "Section 856's text makes it clear that (a)(2)'s 'purpose' is not the defendant's [i.e. the parents']."[12] According to the Majority, this result follows not only from the text of the statute, but "from the way that paragraphs (a)(1) and (a)(2) are written and *structured*."[13]

## II.

Congress did not historically enact legislation targeted at owners or managers of property where drugs were used. However, after "very dirty and unkempt houses

---

[11] *In re Visteon Corp.*, 612 F.3d 210, 231 (3d Cir. 2010).
[12] *Safehouse*, 985 F.3d at 233.
[13] *Safehouse*, 985 F.3d at 233 (emphasis added).

blighted . . . neighborhoods, attracting a stream of unsavory characters at all hours,"[14]

Congress found it necessary to legislate. Initially, the statute passed by Congress was

"effectively used to shut down crack houses."[15] However, legislation before enactment

of 21 U.S.C. § 856(a)(2) did not reach club promoters and "rave" organizers who profited

from drug use at their events. As Judge Roth explains, then-Senator Joseph Biden

introduced an amendment to § 856(a)(2) in 2003 to reach "rogue [club] promoters" who

"not only know that there is drug activity at their event[s] but also hold the event[s] for

the purpose of illegal drug use or distribution."[16] Senator Biden made it clear that this

was a targeted extension of criminal liability focused on the actions of the "few

promoters out there who are taking steps to profit from drug activity at their events."[17]

He even cautioned that § 856(a)(2) had not been—and should not be—used to "prosecute

legitimate" businesses.[18] Subjecting Safehouse to criminal prosecution under that statute

is far worse than prosecuting a legitimate business. It is prosecution of an entity engaged

in the struggle against the very evil that the Bill was intended to combat. It is the polar

opposite of the evil then-Senator Biden had in mind when this legislation was proposed.[19]

---

[14] *Id.* at 230.

[15] 149 Cong. Rec. S1679 (2003).

[16] *Safehouse* at 245 (Roth, J., dissenting). *See also* 149 Cong. Rec. S1679. Section 856 was later adopted as part of the 2003 Prosecutorial Remedies and Other Tools to end the Exploitation of Children Today (PROTECT) Act.

[17] 149 Cong. Rec. S1678 (2003).

[18] *Id.*

[19] *See Safehouse*, 985 F.3d at 251 (Roth, J., dissenting).

As I suggested earlier, even the Majority appreciates that a purely textual reading of this statute achieves a result that conflicts with congressional intent. They explain that under the statute, criminal liability attaches when drug activity is a "significant" purpose of the third-party visitor.[20] Though there has been no relevant finding or stipulation, they assert that § 856(a)(2) is violated in this case because "for most people, using drugs at Safehouse . . . will be a significant purpose of their visit."[21]

To avoid the problem of parental liability in Judge Roth's hypothetical, my colleagues in the majority insist that parents could not be prosecuted based on a child's drug use in their home because such use would merely be "incidental" to him/her living there.[22] They state that, instead, "[p]eople use these places to eat, sleep, and bathe."[23] Excluding criminal liability where drug use is "merely incidental" to occupancy is necessary to avoid the absurd results of Judge Roth's hypothetical. But, of course, there is no such textual limitation in 18 U.S.C. § 856(a)(2). Moreover, the creative limiting language that the Majority reads into the statute does not preclude criminal liability of parents if an addicted child is not very concerned about eating, sleeping or bathing at home as long as s/he can use drugs there. In such a scenario, the child's significant purpose would be using drugs in the home. Given the tenacity of the craving occasioned by addiction and the distorted priorities that accompany addiction, that is not only

---

[20] *Id.* at 237.
[21] *Id.* at 238.
[22] *Id.*
[23] *Id.*

9

possible, it is quite probable. The purpose of such addicted persons would be no different than the purpose the Majority assigns to visitors to Safehouse. The text of § 856(a)(2) does not allow for any distinction.

Their parsing of the statutory text alone purports to inform my colleagues in the Majority that "the actor's purpose must be more than 'merely incidental.'"[24] We are told this adherence to the text avoids the evil of judges making policy and that a contrary holding would be judicial-policy-making.[25] As I have already suggested, the problem is that this interpretation is not based solely on clear text despite the Majority's assertions to the contrary. Rather, it is based on nothing more than the need to avoid the uncomfortable absurdity that flows directly from a literal interpretation of the statute.

Where is the language that is needed to exclude situations where the actor's purpose is "merely incidental" to the drug usage? Nowhere does the text of the statute require the use to be incidental to avoid criminalization and nowhere does the Majority assist in defining these terms. The Majority adds that, while it is the visitors who are required to, and do, have the significant purpose of using drugs, "[i]n any event, Safehouse [itself] has a significant purpose that its visitors do drugs."[26] But the Majority's analysis fails to address the possibility that—like Safehouse—parents may too have the "significant purpose" of allowing loved ones to consume drugs in their home to avoid a fatal overdose. In fact, given all of the agony of living with someone afflicted

---

[24] *Safehouse*, 985 F.3d at 237.
[25] *See id.* at 243.
[26] *Id.* at 238.

with severe drug addiction, it is highly likely that a significant (and possibly the only) parental purpose for keeping an addicted adult "child" at home would be ensuring a lifeline in the event of an overdose.

The Majority takes the absurd results one step further in making a finding that Safehouse's own significant purpose is for third parties to use drugs at its facility.[27] However, no visitor is "required to use the Consumption Room to be eligible for *any* of Safehouse's other services, nor will Safehouse provide, store, handle, or encourage the use of drugs, or allow others to distribute drugs on its property."[28]

### III.

Nearly everyone here agrees that Congress did not envision the situation posed by Safehouse's Consumption Room when it enacted 21 U.S.C. § 856(a)(2). The District Court explained:

> [T]here is no support for the view that Congress meant to criminalize projects such as that proposed by Safehouse. Although the language, taken to its broadest extent, can certainly be interpreted to apply to Safehouse's proposed safe injection site, to attribute such meaning to the legislators who adopted the language is illusory. Safe injection sites were not considered by Congress and could not have been, because their use as a possible harm reduction strategy among opioid users had not yet entered public discourse.[29]

---

[27] *Id.* ("For Safehouse itself has a significant purpose that its visitors use heroin, fentanyl, and the like.").

[28] *Id.* at 244 (Roth, J., dissenting) (emphasis in original).

[29] *United States v. Safehouse*, 408 F. Supp. 3d 583, 585-86 (E.D. Pa. 2019).

The Majority concedes that Congress could not have conceived that operations such as Safehouse would be criminalized by enacting the statute but cites *Pa. Dep't of Corrections v. Yeskey* to argue that should not influence our statutory inquiry.[30] But of course, *Yeskey* did not involve the kind of creative judicial amendment that the Majority slips into the statute. Rather, there, the Court simply held that a prisoner could sue a state penal institution under the ADA because "[s]tate prisons fall squarely within the statutory definition of 'public entity,' which includes 'any . . . agency . . . or other instrumentality of a State . . . or local government.'"[31] It was therefore irrelevant that Congress did not intend to subject prisons to such claims. The plain text authorized them.

It is, of course, correct to observe that "[s]tatutes often reach beyond the principal evil that animated them[,]" as my colleagues do in citing *Sedima, S.P.R.L. v. Imrex Co.*[32] They correctly remind us that "though Congress meant RICO to target mobsters, it reaches far beyond them to legitimate business as well."[33] The analogy does not advance our inquiry. Congress clearly intended to reach individuals who operate a criminal "enterprise" through a pattern of racketeering when it enacted RICO. Courts did not have to read any language into the statute to hold that legitimate businesses could constitute an enterprise if persons other than traditional "mobsters" conducted their affairs through a pattern of racketeering activity.

---

[30] *Safehouse*, 985 F.3d at 238.
[31] 524 U.S. 212, 210 (1998).
[32] *Safehouse*, 985 F.3d at 238.
[33] *Id.* (citing *Sedima S.P.R.L v. Imrex Co.*, 473 U.S.479, 499 (1985)).

As Judge Roth notes in dissent, none of the examples relied upon by the Majority include imposing criminal sanctions on someone based upon someone else's "purpose." Neither she nor I "know of . . . [a] statute, other [than] § 856(a)(2), in which the 'purpose' of an unnamed third party would . . . determine[] the mens rea necessary for a defendant to violate the statute."[34] There is little comfort in the argument that this is required in order to avoid the evil of judicial-policy-making.

At oral argument, the Government confidently proclaimed that Safehouse's Consumption Room "is exactly the type of thing that Congress was concerned about, even though they didn't specifically know about injection sites."[35] That is simply wrong. Not surprisingly, no authority was offered to support that bare assertion, and none has been offered in its brief to this Court. And subsequent events prove its fallacy. Since 21 U.S.C. § 856(a)(2) was enacted, the federal government has adopted a policy of overdose prevention.[36] Moreover, most states now have Syringe Exchange Programs, which provide clean needles to drug users to reduce the transmission of blood-borne diseases.[37]

---

[34] *Id.* at 245 (Roth, J., dissenting).

[35] Transcript of Oral Argument at 23, *United States v. Safehouse*, 985 F.3d 225 (2021) (No. 20-1422).

[36] *See* U.S. Dept. of Health & Human Services, Strategy to Combat Opioid Abuse, Misuse, and Overdose (2017), https://www.hhs.gov/opioids/about-the-epidemic/hhs-response/index.html.

[37] While the federal government cannot provide funds for the purchase of syringes, once a state has demonstrated the need for a needle exchange program, they can get funding from the Center for Disease Control to provide services including (but not limited to) personnel, syringe disposal kits, and education in support of syringe exchange programs. The prohibition on using federal funds to purchase syringes does not prevent the CDC from extolling the benefits of such programs. *See Safehouse* 985 F.3d at 239; *see also*

Several of these interventions are recommended by the Center for Disease Control.[38] Safehouse is simply not the type of "place" that Congress was concerned about when the statute was enacted. One need only look to the aforementioned statement of then-Senator Biden to appreciate just how far off the mark the Government's contrary assertion was. We simply cannot (and should not) presume that Congress meant to equate the efforts of Safehouse with crack house operators and expose them to 20 years in prison. Furthermore, as the District Court explained in its scholarly opinion, traditional rules of statutory construction counsel against it.

## IV.

I end where I began. I fully appreciate that the final answer to this inquiry must come from Congress. Only Congress can clarify the intended scope of 21 U.S.C. § 856(a)(2). In the interim, whether or not the Majority's analysis is correct, this case is simply too important to deny *en banc* review. It deserves to be heard by the full court. I therefore must respectfully dissent from our denial of the Petition for Rehearing. Judge Restrepo joining Judge McKee's dissent.

---

States' Amicus at 8; *see also* Center for Disease Control, Federal Funding for Syringe Service Programs, https://www.cdc.gov/ssp/ssp-funding.html#regarding-funding.
[38] Center for Disease Control, Summary of Information on the Safety and Effectiveness of Syringe Services Programs (SSPs), https://www.cdc.gov/ssp/syringe-services-programs-summary.html ("Syringe services programs can benefit communities and public safety by reducing needlestick injuries and overdose deaths, without increasing illegal injection of drugs or criminal activity.").